# EXHIBIT 5

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

RANDY LUNDY,            )
  Plaintiff,           )
                       )
  -vs-                 ) No. CIV-22-699-F
                       )
HL MOTOR GROUP, INC., ET )
AL.,                    )
  Defendants.          )
_____

FARMERS MUTUAL FIRE INSURANCE )
COMPANY OF OKARCHE,           )
  Plaintiff,                 )
                             )
  -vs-                       )
                             )
HL MOTOR GROUP, INC., ET AL.  )
  Defendants.                )

VIDEOTAPED/TELECONFERENCE DEPOSITION OF ALEXANDER SAITOV
TAKEN ON BEHALF OF
FARMERS MUTUAL FIRE INSURANCE COMPANY OF OKARCHE
ON APRIL 5, 2023

REPORTED BY:  MARTA MATTINGLY, CSR, RMR

## Page 2

```
 1            A P P E A R A N C E S
 2
     For Randy Lundy:     Rodney Stewart
 3    (via Zoom)          STEWART LAW FIRM
                          Attorney at Law
 4                        801 N.W. 63rd, Suite 100
                          Oklahoma City, OK  73116
 5                        rds@rstewartlaw.com
     For Farmers:         Gerard Pignato
 6    (via Zoom)          RYAN, WHALEY
                          Attorney at Law
 7                        400 North Walnut
                          Oklahoma City, OK  73104
 8                        jerry@ryanwhaley.com
 9
     For HL Motor Group   Michael Franz
10   and Ognjen Milanovic: LEWIS, BRISBOIS
      (via zoom)          Attorney at Law
11                        1605 West Adams, #300
                          Chicago, IL  60661
12                        michael.franz@lewisbrisbois.com
13   Also present:        Eric Keiffer - Videographer
      (via Zoom)          J. Butterworth
14
15
```

## Page 3

C O N T E N T S

DIRECT EXAMINATION BY MR. PIGNATO ................. 5
CROSS EXAMINATION BY MR. STEWART .................. 38

E X H I B I T S

EXHIBIT NUMBER 1 ................. 18
EXHIBIT NUMBER 2 ................. 30

## Page 4

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of ALEXANDER SAITOV may be taken on behalf of Farmers on April 5, 2023, via Zoom, by Marta Mattingly, Certified Shorthand Reporter within and for the State of Oklahoma, pursuant to notice and agreement.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition is taken pursuant to The Federal Rules of Civil Procedure.

* * * * *

Page 5

1     (Deposition commenced at 9:33 a.m.)
2         THE VIDEOGRAPHER: We are now recording.
3         ALEXANDER SAITOV,
4  after being first duly sworn, testifies as follows,
5  to-wit:
6         DIRECT EXAMINATION
7  BY MR. PIGNATO:
8     Q   Would you state your full name, please.
9     A   My full name is Alexander Saitov.
10    Q   How do you spell your last name?
11    A   S-a-i-t-o-v.
12    Q   Mr. -- do I pronounce it Saitov?
13    A   Saitov.
14    Q   Okay. I just want to pronounce it the way
15 it's supposed to be pronounced. If I don't do it that
16 way, I promise you, I am not doing it intentionally.
17        With that, Mr. Saitov, where are you currently
18 located in terms of city or province or country?
19    A   So it is Concord, Ontario, in Canada.
20    Q   All right. Thank you very much. What is your
21 occupation and profession?
22    A   So my current occupation is, profession, is VP
23 of safety and compliance.
24    Q   The what, safety, what was it?
25    A   Vice-president, safety and compliance.

Page 6

1     Q   For what company?
2     A   For Highlight Motor Group.
3     Q   How long have you held the position of VP of
4  safety and compliance for Highlight Motor Group?
5     A   Since last year.
6     Q   Be 2022?
7     A   2022.
8     Q   We are taking your deposition today, April 5,
9  2023. Do you agree with that?
10    A   I agree.
11    Q   I'm just trying to put it in context, the
12 amount of time that you have worked at Highlight, and
13 when this case goes to trial, so the jury will
14 understand when you gave your deposition. That's why I
15 asked that question.
16        What did you do, sir, before you went to work
17 at Highlight?
18    A   So before I started work -- I started work for
19 Highlight in November 2014. And before that, I worked
20 for another trucking company called TransAm Carriers.
21    Q   During what period did you work for the Old
22 TransAm Carriers?
23    A   So the correct name is TransAm, TransAm
24 Carriers. So I worked for them since September 2012
25 until October 2014.

Page 7

1     Q   And do I understand, sir, that you actually
2  began your employment at Highlight in 2014?
3     A   That is correct.
4     Q   All right. So if you would, please, take me
5  through your employment at Highlight beginning in 2014,
6  what your various positions and responsibilities were.
7  Thank you.
8     A   So I started in November 2014 as a safety
9  manager. And I remained in this position up until last
10 year. Then in 2022, I was promoted to vice-president of
11 safety and compliance.
12    Q   What have your responsibilities been as safety
13 manager and now as the VP of safety?
14    A   So my responsibilities as safety managers --
15 as safety manager were the -- the responsibility
16 relating to the safety of our operations. That includes
17 the development and maintaining of our safety policy and
18 our safety programs.
19        Such programs as preventive maintenance policy
20 program, training program for drivers, programs in
21 regards to out-of-service regulations, compliance, drug
22 and alcohol policy and program, load securement,
23 transportation of dangerous goods or HAZMAT, then motor
24 crossing procedures. So that's -- that's the main --
25 the most of it, the major.

Page 8

1     Q   How important is safety for a trucking company
2  like Highlight?
3     A   Extremely important.
4     Q   Is it the most important --
5     A   Safety is of paramount importance, yes.
6     Q   All right. Thank you. Have you given
7  deposition testimony before today?
8     A   Yes.
9     Q   Did you give prior deposition testimony as a
10 corporate representative, like you are doing today?
11    A   Yes, I did.
12    Q   Do you understand that as a corporate
13 representative testimony today is the testimony of the
14 company? Do you understand that?
15    A   I understand.
16    Q   Okay. And previously you have given testimony
17 as the corporate representative for the company?
18    A   Yes.
19    Q   Have you given prior deposition testimony in
20 connection with lawsuits arising from the United
21 States or filed in the United States?
22    A   Most of it's filed in the United States, yes.
23    Q   When is the last time you did that?
24    A   The last time was -- the last time was -- it
25 was in January.

Page 9

1  Q   Of 2023?
2  A   2023.
3  Q   All right. So we are talking about three to
4  four months ago?
5  A   Around that.
6  Q   Did any of the issues in that case involve a
7  situation where one of your drivers blacked out or lost
8  consciousness, causing him or her to veer off the
9  highway and strike a building or a person?
10 A   I'm sorry. Could you please repeat it?
11 Q   Yes. I am trying to understand the case where
12 you gave deposition testimony a couple of months ago.
13 Were any of the issues or claims in that case, were
14 defenses raised in that case similar to the issues in
15 the present case, where one of your drivers claimed that
16 he blacked out or lost consciousness, causing him to
17 leave the roadway?
18 A   Sir, my understanding, you are asking me about
19 previous deposition; right?
20 Q   Yes, sir.
21 A   So this is a completely separate case, which
22 has nothing to do with this case.
23 Q   Yeah. I am exploring the possibility that
24 your company has raised similar defenses in other cases,
25 and that's why I'm asking that question. Do you

Page 10

1  understand?
2  A   I am trying to understand, though, I don't see
3  much relevance to the other case and not -- it's
4  completely different case, a different nature.
5  Q   I know it's a different case, but I don't know
6  if it's a different nature yet until and unless you
7  answer my questions about that other case. Will you
8  agree to do so?
9  A   So, basically, that case has nothing to do
10 with this case. It is a different nature and none of
11 what you mentioned is relevant to that case.
12 Q   Let me --
13     MR. FRANZ: Alex, go ahead and answer his
14 questions. You can answer his questions. His questions
15 are proper. Go ahead and answer them.
16     THE WITNESS: Okay.
17 Q   (By Mr. Pignato) Let me rephrase the question
18 for you. You might be more comfortable with this
19 question.
20 A   Okay.
21 Q   The case you gave deposition testimony in a
22 couple of months ago, what were the nature -- what was
23 the nature of that case? What were the claims asserted
24 and what were the defenses raised?
25 A   So the nature was the vehicle operated by our

Page 11

1  driver rear-ended another vehicle on the ramp,
2  acceleration ramp, merging with the highway.
3  Q   In that case did your driver claim he lost
4  consciousness, blacked out?
5  A   No.
6  Q   All right. Thanks. That's all I was trying
7  to get at.
8      Now, I gather from your testimony you have
9  given depositions as a corporate representative even
10 before January of 2023; am I correct?
11 A   That is correct.
12 Q   All right. And in any of the prior cases
13 where you gave deposition testimony, did any of those
14 cases involve a situation like we have here in the
15 present case, where one of your drivers claimed he lost
16 consciousness or blacked out, causing him to drive off
17 the roadway or strike another building or structure?
18 A   No.
19 Q   Is this the first time you have given
20 testimony in a lawsuit where one of your drivers claimed
21 he lost consciousness or blacked out causing him to
22 drive off the roadway?
23 A   No.
24 Q   There was a prior occasion where that
25 occurred?

Page 12

1  A   Where driver blacked out? Never.
2  Q   Okay. Maybe you misunderstood my question or
3  maybe I misunderstood your answer.
4  A   Would you please repeat it?
5  Q   Yeah, I will. Have you given testimony in any
6  prior lawsuits where the issue was whether or not your
7  driver blacked out or lost consciousness before veering
8  off the roadway?
9  A   No, never.
10 Q   Is this the first time you have been involved
11 in a lawsuit, the issue was whether your driver blacked
12 out or lost consciousness before driving off the
13 roadway?
14 A   Yes.
15 Q   Thank you, sir. Have you had a chance to
16 review the deposition notice that contains topics?
17 A   Yes. I had a chance.
18 Q   All right. Do you have that in front of you?
19 A   Yes. I have it.
20 Q   What other documents do you have in front of
21 you?
22 A   I have a document with the caption Exhibit
23 Number 1.
24 Q   Is that the deposition notice?
25 A   It doesn't say -- Notice To Take Deposition,

Page 17

1    A   Yes, I do.
2    Q   Were you the person who hired Mr. Milanovic?
3    A   No, I wasn't.
4    Q   Did you make any decisions regarding Mr.
5    Milanovic's employment after the accident of August 8,
6    2020?
7    A   No, I didn't.
8    Q   Do you know whether or not Mr. Milanovic was
9    assigned any further driving assignments from Highlight
10   after his accident of August 8, 2020?
11   A   He wasn't assigned any.
12   Q   Do you know why not?
13   A   Because he discontinued, he basically
14   discontinued working for us.
15   Q   So is it your testimony, sir, and then the
16   testimony of the company, that Mr. Milanovic is the one
17   who determined he would no longer drive for the company?
18   A   Yes.
19   Q   It was not a situation, then, where the
20   company decided it would not use Mr. Milanovic any
21   further?
22   A   No.  It wasn't us.
23   Q   Do you know why he decided not to drive
24   anymore?
25   A   I don't know.

Page 18

1    Q   I want to go over with you -- I don't recall
2    if I said I was marking it as Exhibit 1.  That's the
3    deposition notice.
4            (Exhibit Number 1 marked for
5             identification and made part of
6             the record)
7    Q   (By Mr. Pignato)  We are going to put it up on
8    the screen.  You are welcome, sir, to look at what we
9    are putting on the screen or you can look at the copy
10   you have in front of you, whatever your preference is.
11   But I do want to go over the topics.
12   A   Sure.
13   Q   We are looking at the list of topics to
14   discuss.  Number 1 is, "This Defendant's denial of any
15   of the allegations contained in numerical paragraph 4 in
16   Plaintiff's Petition, as set forth in this Defendant's
17   Answer."
18        Have you read the petition filed by my client,
19   Farmers Mutual Fire Insurance Company of Okarche?
20   A   Yes, I have.
21   Q   And have you read the answer filed by the
22   defendants, HL Motor Group, Inc., Highlight Motor
23   Freight USA, Inc.?
24   A   Yes, I have.
25   Q   All right.  Are you prepared, then, to answer

Page 19

1    questions within topic Number 1?
2    A   I think I am.
3    Q   All right.  And what about Number 2, Mr.
4    Milanovic's driving record prior to the subject
5    accident, do you have some knowledge that you can share
6    with us regarding that topic?
7    A   Yes.
8    Q   3, "Any investigation conducted by this
9    Defendant to determine the amount of money paid by
10   Plaintiff to its insured, Earlene Carr under the
11   insurance policy issued to Ms. Carr by FMFICO," that's
12   -- those are the initials of my client, "as a result of
13   the subject accident and loss."  Do you have any
14   knowledge or information to provide in connection with
15   that topic?
16   A   No.
17   Q   You don't?  Okay.
18        MR. PIGNATO:  Let me ask, Michael, we
19   have discussed off the record at the last deposition, at
20   least my understanding of that discussion was, that
21   there was not going to be any kind of objection asserted
22   to the amount -- the damages that my client is seeking
23   in this lawsuit.  I think the same applied to the Lundy
24   lawsuit, also.  Can you confirm or clarify that?
25        MR. FRANZ:  I will confirm that, yes.

Page 20

1         MR. PIGNATO:  Thank you.  Because I can
2    shorten this deposition a lot shorter that way.
3    Q   (By Mr. Pignato)  Topic Number 4 is similar,
4    sir, it says, "The amount of money this Defendant
5    contends Plaintiff is owed by this Defendant or its
6    insurance company."
7         MR. PIGNATO:  I am assuming that,
8    Michael, that is a moot topic, as well, then?
9         MR. FRANZ:  I would agree.
10        MR. PIGNATO:  All right.
11   Q   (By Mr. Pignato)  Number 5.
12        MR. STEWART:  Hey, Jerry, to interrupt,
13   Michael, same regarding Lundy?
14        MR. FRANZ:  Yes.
15        MR. STEWART:  Thank you.
16   Q   (By Mr. Pignato)  I believe Number 5 is the
17   same category, but let me read it just to be sure.  If
18   this Defendant contends that my client is not entitled
19   to recover from this Defendant and/or its insurance
20   company the insurance proceeds paid to and on behalf of
21   Ms. Carr, as set forth in this Defendant's Answer to
22   numerical paragraph 7 in Plaintiff's Petition, the
23   factual basis for such position.
24        MR. PIGNATO:  The same agreement,
25   Michael?

Page 33

1    confused, very confused.  Obviously, he was stressing
2    out.  But I examined his logbooks, he complied.  He had
3    necessary -- he took necessary rest breaks, slept for
4    ten hours.  So based on this evidence, the conclusion --
5    the conclusion that he was sleepy, it's speculation.
6    There wasn't evidence that he was sleepy.
7        Q    So if I understand you correctly, the evidence
8    that supports your belief that Mr. Milanovic lost
9    consciousness before he left the roadway is, in part,
10   the medical records for his treatment at Oklahoma
11   Medical Hospital after this accident?
12       A    Yes.  Yes.
13       Q    Do any of the medical records say he lost
14   consciousness before he left the roadway as opposed to
15   his impact with the houses?
16       A    I -- I don't recall that any of medical
17   records says that.
18       Q    What medical condition, then, caused him to
19   leave the roadway?
20       A    I am not medical expert.  I cannot tell you --
21       Q    Does your company --
22       A    I cannot answer this question.
23       Q    I interrupted you.  I apologize.  Does your
24   company take a position on whether or not Mr. Milanovic
25   had a medical condition that caused him to lose

Page 34

1    consciousness and leave the roadway?
2        A    It's our company's understanding, that due to
3    some medical condition, medical emergency condition, he
4    lost consciousness, and after that, he departed and went
5    off the road.
6        Q    I understand that's the company's position.
7    My question to you, sir, is, does your company have a
8    position, an opinion, on the nature of the medical
9    condition in question?  What was that medical condition?
10            MR. FRANZ:  Objection.  That calls for
11   expert testimony.
12       Q    (By Mr. Pignato)  Go ahead.
13            MR. FRANZ:  You can answer, Alex.
14            THE WITNESS:  So I am not a medical
15   professional.  We don't -- we are not familiar, we
16   cannot judge and provide our opinion on -- we are not
17   professionals in the field on what type or nature of
18   medical condition led to him lose consciousness.
19       Q    (By Mr. Pignato)  Do you know if anyone has
20   ever identified a medical condition that caused him to
21   lose consciousness and leave the roadway?
22       A    I don't.
23       Q    But in any event, Highlight, your employer, is
24   unaware of a medical condition that caused Mr. Milanovic
25   to lose consciousness and leave the roadway; am I

Page 35

1    correct?
2        A    We are not --
3             MR. FRANZ:  Objection.  That misstates
4    prior testimony.
5        Q    (By Mr. Pignato)  Go ahead.
6        A    As long as my legal counsel is objecting, I
7    would rather not answer this question.
8             MR. FRANZ:  No, Alex, you can answer.  I
9    have laid the objection, but you can answer the
10   question.  I am not instructing you to not answer.
11            THE WITNESS:  So we are not aware of the
12   name or nature of that medical condition.
13            MR. STEWART:  Are we finished with the
14   exhibit?
15            MR. PIGNATO:  Yes, thank you, Rodney.
16            MR. STEWART:  That's apparently my job
17   today, my role.
18            MR. PIGNATO:  I have a feeling you are
19   going to have a much more important role shortly.
20       Q    (By Mr. Pignato)  Mr. Saitov, do you know
21   whether or not Mr. Milanovic has experienced any similar
22   medical episodes since or after August 8, 2020?
23       A    No.  I am not aware.
24       Q    Do you know if any doctor has ever told Mr.
25   Milanovic, after August 8, 2020, that he suffered some

Page 36

1    sort of medical episode on August 8, 2020, that caused
2    him to lose consciousness and leave the roadway?
3        A    I don't.
4        Q    I want to ask you a couple of questions
5    regarding liability insurance.  As a safety director, do
6    you have any responsibility in procuring liability
7    insurance for the company?
8        A    Yes, I do.
9        Q    And we have been provided information
10   regarding the liability insurance that was provided to
11   Highlight at the time of the accident.  My question to
12   you is, do you know whether or not your company had a
13   self-insured retention?  Do you know what that is?
14       A    A self-insured retention?  Would you please
15   explain it to me?
16       Q    Yeah.  Where the liability insurance kicks in
17   after a certain amount of money has first been incurred
18   by the company.  It might be 100,000, 500,000, a
19   million.  It's different with everyone.  Do you know if
20   that's applicable in this case?
21       A    So if that's what we call deductible, is it
22   the same?
23       Q    They are similar.  There are some differences.
24   But if you have a deductible, I would like to know what
25   you understand your deductible is?

Page 37

1    A    So if we are talking about deductible, then
2    our deductible is 100,000.
3         Q    You understand, then, that before your
4    liability insurance applies, you are responsible for the
5    first $100,000 paid to a claimant?
6         A    Not necessarily. So my understanding is that
7    deductible applies to the cases where property damage
8    incurred and not necessarily to liability in regards to
9    injuries or --
10        Q    All right.
11        A    So it's not applicable in all cases, that's
12   what I'm trying to say. So we need to understand which
13   case we are talking about.
14        Q    All right. Well, in this -- I represent the
15   plaintiff, Farmers Mutual. Mr. Stewart, who you will
16   hear from shortly, represents the plaintiff in a
17   companion lawsuit named Lundy.
18             Does this $100,000 deductible that you are
19   talking about, is it applied to both cases, both to
20   Lundy and to Oklahoma Farmers Mutual?
21        A    That, I don't know. So that's a question for
22   insurance professionals, whether our insurance policy
23   stipulates that our $100,000 deductible would apply to
24   this particular case.
25        Q    All right. Do you want to take a five-minute

Page 38

1    break?
2         A    Yeah.
3              MR. PIGNATO: Rodney, I've got no further
4    questions. So I am ready to pass the witness.
5              THE REPORTER: Okay. We will go off the
6    record for five minutes, Eric.
7              THE VIDEOGRAPHER: Thank you.
8              (Short break)
9                  CROSS EXAMINATION
10   BY MR. STEWART:
11        Q    Mr. Saitov, my name is Rodney Stewart. I
12   represent a fellow by the name of Randy Lundy, who owned
13   some of the property that your truck collided with back
14   in August of 2020. Do you understand that?
15        A    I understand.
16        Q    All right. And so far I've been listening to
17   you here for about an hour. And you seem pretty
18   straightforward, what we might call here in Oklahoma a
19   straight-shooter. All right? So let's test that, me
20   and you. Okay?
21        A    Okay.
22        Q    All right. So earlier you saw a narrative
23   from the investigating Oklahoma Highway Patrol officer
24   indicating that your driver -- the indications were that
25   your driver was a sleepy driver, fell asleep, and caused

Page 39

1    this collision. Do you recall discussing that a few
2    moments ago with Mr. Pignato?
3         A    I recall, yes.
4         Q    All right. So I know you disagree with that.
5    But just for a minute, let's say it's true. Okay?
6    Let's say your driver was tired, fatigued, and fell
7    asleep. Are you with me?
8         A    Yeah.
9         Q    All right. You would agree with me, that if
10   that's the case, that accident would be entirely
11   preventable on his part?
12        A    That changes the story. If the cause was the
13   fatigue, that he fall asleep, that could have been --
14   that could have been prevented.
15        Q    When you say could have been prevented, it
16   would be, in fact, preventable, if a driver is fatigued,
17   he's tired, and he falls asleep and runs off the road,
18   the accident is entirely his fault, is it not, sir?
19        A    It -- you are asking about hypothetical. But
20   possibility, if he had fallen asleep?
21        Q    Yes. I am making the assumption --
22        A    Yeah.
23        Q    -- for purposes of my question. You are
24   calling it a hypothetical. That's fine with me. Okay?
25   That your driver fell asleep, ran off the road, and

Page 40

1    crashed into these houses. I am asking you, as the
2    vice-president of safety, former safety manager of this
3    company, would that accident be your driver's fault?
4         A    If he had fallen asleep then, it would have
5    been his fault.
6         Q    All right. And by extension, your company's
7    fault, HL Motor Group's fault; yes?
8         A    Yes. That's correct.
9         Q    Now, is HL -- and I am just going to shorten
10   it to HL instead of Highlight, if that's all right with
11   you.
12        A    Absolutely.
13        Q    Okay. Is HL a responsible motor carrier?
14        A    Absolutely.
15        Q    Is HL concerned about the safety and
16   well-being of its drivers?
17        A    Absolutely.
18        Q    You have testified earlier that safety, in
19   fact, is of paramount importance; right?
20        A    Absolutely, right.
21        Q    You understand that your drivers are
22   responsible, your driver in this case was responsible
23   for operating a 55,000-pound vehicle that rolls down the
24   roads at speeds of upwards of seventy-five miles an
25   hour; right?

Page 49

1  between impairment, when driver is impaired by whatever
2  reason is, by fatigue or by dehydration, to the extent
3  that he is not able to control the vehicle and the
4  reason of that as mild dehydration.  So I don't
5  understand what it means.  Give me an objective
6  definition of -- definition of mild dehydration.
7      Q   I can't -- I can't give you a medical
8  definition.  But I am simply -- the purpose of my
9  questions today is just to find out if you are aware of
10 the concept, that dehydration leads to impairment, leads
11 to a driver not being his physical and mental best?  Are
12 you aware of it or not?
13     A   As I previously mentioned, I would agree that
14 extreme dehydration, to the extreme levels, to the
15 extreme levels, would lead to the impairment, which
16 would affect the ability to operate a commercial motor
17 vehicle.
18     Q   All right.  And do you agree that an extreme
19 level of dehydration would be a preventable circumstance
20 by the driver?
21     A   I would agree.
22     Q   If a person had dehydration to the extent that
23 they lost consciousness, you would agree that would be
24 preventable by the truck driver?
25     A   I would agree.

Page 50

1      Q   All right.  So does HL provide any new hire,
2  long-haul, truck drivers any training regarding proper
3  hydration?
4      A   That is not part of our training program.
5      Q   Does HL have any policies in place to prevent
6  incidents of driver dehydration?
7      A   It's not of our policies.
8      Q   So, then, is it HL's position that proper
9  hydration for its drivers is solely the responsibility
10 of the truck driver?
11     A   It is obviously a responsibility of the truck
12 driver.  But, again, what HL does, it enforces hours of
13 service policy, requiring drivers to take rest breaks,
14 specifically for theirs needs of drinking water, eating
15 properly, and other issues relating to their health and
16 well-being.
17     Q   All right.  So as long as the driver stops at
18 least once every eight hours, then the responsibility to
19 stay hydrated rests solely with the driver?
20     A   Responsibility stays, yes, with the truck
21 driver, yes.
22     Q   And I think you have already said this, but
23 just to be clear, do you agree that dehydration is
24 100 percent avoidable?
25     A   Dehydration is 100 percent avoidable, yes.

Page 51

1      Q   And you also would agree a driver is
2  responsible for keeping himself physically and mentally
3  alert while driving; agree?
4      A   Can you repeat it again?
5      Q   Sure.  A driver is responsible for keeping
6  himself physically and mentally alert while driving?
7      A   Absolutely.
8      Q   All right.  A driver is responsible for
9  ensuring that he or she is properly hydrated at all
10 times to avoid any negative effects of dehydration;
11 agree?
12     A   Can you repeat again?
13     Q   Sure.  A driver is responsible for ensuring
14 that he or she is properly hydrated at all times to
15 avoid any negative health consequences of the
16 dehydration, that might impair the ability to drive?
17     A   Agree.
18     Q   And, of course, a driver is responsible for
19 being aware of the signs of fatigue or dizziness or
20 weakness or any other symptom that could impair one's
21 ability to operate a 55,000-pound motor vehicle at
22 seventy-five miles per hour safely; agree?
23     A   Agree.
24     Q   And in this context, I want you to assume that
25 Mr. Milanovic was dehydrated and that's why, as you say,

Page 52

1  he lost consciousness.  All right?
2      A   Not all right.
3      Q   Say again?
4      A   Not all right.  You want me to assume.  I
5  don't assume.
6      Q   Well, you do assume, and you've testified
7  previously to Mr. Pignato, you do assume that your
8  driver lost consciousness before he left the roadway;
9  correct?
10     A   Correct.
11     Q   All right.  So I want you to assume for the
12 moment that your defense in this case, whether you know
13 it or not, is that your driver was dehydrated and that's
14 why he lost consciousness.  Okay?  Will you make that
15 assumption with me for purposes of these questions?
16     A   So you just want me to hypothetically assume?
17     Q   I want you to assume my hypothetical, which
18 is, your driver lost consciousness because he was
19 dehydrated, yes.  Will you assume that for purposes of
20 my question?
21     A   For the purposes of -- just for the sake of
22 the question, I can hypothetically assume it.
23     Q   So you would agree, if those were the facts,
24 that would be a self-induced condition, that is,
25 dehydration?

Page 53

1   A   That would be self-induced, sorry, what?
2   Q   The condition, the medical condition here, of
3   dehydration, would be self-induced; agree?
4   A   Medical condition. So dehydration as a
5   medical condition will be self-induced by the driver;
6   right?
7   Q   That's my question to you. If the driver
8   becomes dehydrated and that's the reason he lost
9   consciousness, that is a self-induced medical condition;
10  agree?
11  A   Agree.
12  Q   Entirely preventable by the driver?
13  A   Absolutely preventable.
14  Q   All right. Now, I want you to also assume
15  that the driver, your driver, has testified in this case
16  that one of the problems he was having while driving on
17  this hot, summer day through Missouri and Oklahoma in
18  ninety plus degree temperatures is that the
19  air-conditioning unit of his truck was not functioning
20  properly. Okay? Will you make that assumption with me?
21  A   Okay. Let's make an assumption.
22  Q   Okay. You agree with me, that would also be a
23  preventable factor; right, sir?
24  A   In terms of repair of conditioner, yes.
25  Q   So if a driver is feeling fatigued or dizzy

Page 54

1   due to dehydration, brought about by the absence of
2   fluids and/or the rising temperatures in his truck,
3   those are preventable factors; correct?
4   A   Correct.
5   Q   All right. A driver is responsible for
6   pulling over immediately on any signs or symptoms of
7   dehydration or other health factors that influence his
8   ability to drive the truck safely; right?
9   A   No.
10  Q   He is not responsible for pulling over
11  immediately among signs or symptoms that he can't
12  properly operate the truck?
13  A   Not necessarily immediately.
14  Q   Well, as soon as he can do so safely.
15  A   As soon as he can do it safely.
16  Q   All right. You wouldn't want him slamming on
17  the brakes in the middle of the highway; right?
18  A   Right.
19  Q   If he couldn't get adequately off the roadway,
20  and therefore became a hazard on the side of the road,
21  you wouldn't want that; right?
22  A   Right.
23  Q   But as soon as a truck driver could get to an
24  exit, if he's having signs or symptoms of heat or other
25  health issues that prevent him from operating the truck

Page 55

1   safely, you would expect him to pull over as soon as it
2   was safe to do so?
3   A   Absolutely.
4   Q   If a driver fails to do that, puts himself in
5   a state of dehydration by not consuming sufficient
6   fluids, not getting enough minerals, maybe operating a
7   truck that's too hot, and succumbs to this condition and
8   a collision results, you would agree that collision is
9   entirely that driver's fault?
10  A   I wouldn't.
11  Q   You wouldn't agree with that?
12  A   I wouldn't agree with it.
13  Q   So what part of it do you disagree with?
14  A   Not necessarily dehydration would play such a
15  role, that it would affect his ability to operate the
16  motor vehicle to such extent that he wouldn't be able to
17  operate safely.
18  Q   So you are saying you don't -- you don't know
19  if that occurred here?
20  A   As I previously said, your assumption implies
21  that any sign, any sign. I, again, am pretty sure that
22  only extreme level dehydration would lead to the
23  condition where he is not able to operate the vehicle
24  safely.
25  Q   Let's see if you and I can agree on something.

Page 56

1   Does it seem plausible or implausible to you that a
2   person would drive a good part of a hot August day in
3   Missouri and Oklahoma, while suffering from such severe
4   dehydration, that he loses consciousness and runs off
5   the road, yet, he wouldn't have any symptoms at all
6   before the moment he lost consciousness? Does that seem
7   plausible or implausible?
8   A   You know, speaking about some hypothetical --
9   Q   Plausible or implausible, sir?
10  A   Can I please answer your question?
11  Q   You can answer the question, then you can
12  elaborate all you would like. Does that seem plausible
13  or implausible?
14  A   Sir, would you allow me to answer the
15  question? I will answer the question.
16  Q   I would ask that you do so. Is it plausible
17  or implausible? Then you can explain your answer.
18  A   My explanation is that, specifically in case
19  of Ognjen Milanovic, looking at his logbook, took a
20  restroom break three hours before the accident, it's
21  not -- it's not possible in his situation, because he
22  had three hours before that took a rest break of
23  forty-five minutes, as I see on his logbook.
24      And for me, three hours of driving is not
25  enough to get to such a level of dehydration, that he

Page 57

1  would be able to lose control, lose consciousness, lose
2  control of his vehicle.
3          Maybe in some other case it's plausible, with
4  some other guy, who probably, possibly drove without the
5  rest break, not three hours, but let's say, I don't
6  know, fifteen hours.
7          But in his case, in his specific case, where
8  we know exactly that he took a break three hours before
9  the accident, that is not plaus -- it's not possible.
10     Q   All right.  I think we might be saying the
11 same thing, but let me try to make sure about that
12 before I move on.  You are saying, that because this man
13 took a 45-minute break just three hours earlier, you
14 believe it is not plausible that he succumbed to
15 dehydration in an instant and lost consciousness and ran
16 off the road without experiencing any other symptoms
17 first?  Do you agree with that?
18     A   Sir, I -- again, I am not medical
19 professional.
20     Q   I accept that.  I am asking for --
21     A   I don't know whether it happens in an instant.
22 I have no idea how it happens.  Maybe it takes a few
23 minutes.  I don't know.  So if you could rephrase your
24 question, then I would be able to properly answer it.
25     Q   I am not sure I can.  You are relying on the

Page 58

1  fact that this gentleman took a three-hour break -- I'm
2  sorry, a 45-minute break three hours before; right?
3      A   Yes.  He took a rest, yeah.
4      Q   And because of that, you do not believe that
5  he succumbed to dehydration, to the extent that he lost
6  consciousness and ran off the roadway; right?
7      A   I don't believe that he succumbed to,
8  specifically to the reason of dehydration.
9      Q   Okay.
10     A   Because of dehydration.
11     Q   You believe that makes no practical sense to
12 you?
13     A   Correct.
14     Q   As the safety manager and/or vice-president of
15 safety for this company for some eight plus years;
16 right?
17     A   I think practically he took a rest break of
18 forty-five minutes, which is more than enough for him to
19 drink water, eat properly.  And I don't believe that he
20 taking rest -- that rest break, wouldn't be able to do
21 it.
22     Q   Would common sense, and I know you are not a
23 medical doctor, but would common sense, if dehydration
24 was the medical condition that caused him to lose
25 consciousness, if that's true, okay, do you believe, in

Page 59

1  your experience in life and as the safety manager for
2  this company, that it's possible for a person to succumb
3  to dehydration at such a fast rate, that the very first
4  sign of a problem was the loss of consciousness?
5      A   Sir, for all of my experience, and I think
6  I've had a relatively large experience with a large
7  number of accidents, I never, ever observed weakness
8  that dehydration played any such role.
9      Q   In causing a driver to lose consciousness and
10 have a collision?
11     A   Yes.
12     Q   All right.  And you make a good point.  I
13 mean, you've probably investigated hundreds of
14 accidents, a thousand or more?
15     A   I don't know the exact number.  But from my
16 experience, I knew cases where drivers were able to
17 travel with not working AC and they were able to travel
18 large distances.  And it didn't lead to the loss of --
19 their ability to operate commercial vehicle was not
20 impaired to such -- to such a level, where they lost
21 consciousness and lost control of their vehicle.
22     Q   Well, you make me pause and ask this, then.
23 You are telling me that you have seen situations where
24 drivers operate on hot days with not fully functioning
25 air-conditioning units.

Page 60

1      A   Yeah.
2      Q   And, yet, that didn't lead to, wasn't a
3  contributing cause, to the collision, is that what you
4  are telling us?
5      A   Yes.
6      Q   All right.  Then how is it that you, as the
7  safety manager or vice-president of safety, are aware of
8  the fact, that after a collision, there was a
9  nonfunctioning air-conditioning unit?
10     A   You mentioned the fact that the air
11 conditioner was not working.
12     Q   Okay.
13     A   I am not aware of it.
14     Q   You are not aware of any problems with the AC
15 units in the trucks --
16     A   No.
17     Q   -- that you all put out on the roadway?
18     A   No.
19     Q   Do you agree, as a responsible motor carrier,
20 HL is certainly aware of the critical need for properly
21 functioning air-conditioning units in its trucks;
22 correct?
23     A   Absolutely correct.
24     Q   All right.  And you, of course, are aware that
25 a poorly performing AC unit, particularly in the hot

Alexander Saitov                                                                         April 5, 2023

Page 61

1  summer months, particularly in the south, can contribute
2  to drivers overheating, becoming dehydrated, fatigued,
3  et cetera; correct?
4      A   Correct.
5      Q   All right.  So is HL responsible for ensuring
6  that the AC units in its big rigs are functioning
7  properly?
8      A   Correct.
9      Q   And at the same time is the driver responsible
10 for reporting any problems with the AC unit in the truck
11 he or she is driving?
12     A   Absolutely correct.
13     Q   All right.  Is it -- is it acceptable to HL,
14 that a driver from northern climates, on his very first
15 trip for HL into the south in the hot summer months,
16 drove ten plus hours on a ninety plus degree day with a
17 poorly performing air-conditioning unit in his truck and
18 did not report that to the company?
19     A   Yeah.  That's -- that's not acceptable.  A
20 driver always -- any driver is supposed to report
21 anything to the company right away.
22     Q   And you have investigated this accident
23 thoroughly.  Have you come across any evidence at all
24 that your driver, Mr. Milanovic, reported to the company
25 before, during, or after his trip, that the

Page 62

1  air-conditioning unit was performing poorly?
2      A   He had never reported any of that.
3      Q   Okay.  Would it be acceptable, if that same
4  driver in those same circumstances, driving ten plus
5  hours in the heat, becomes dehydrated, loses
6  consciousness, and drives off the road into family
7  residences, is that acceptable to HL?
8      A   Absolutely not acceptable.
9      Q   All right.
10     A   I'm sorry, my camera.
11     Q   And do you agree, if those are the facts, the
12 accident I just described, you would agree with me that
13 accident would be entirely preventable?
14     A   Would I agree, this vehicle accident would be
15 preventable?
16     Q   Yes.  If the facts are as I laid out to you.
17 And I am really focusing on two facts.  You have got a
18 poorly performing air-conditioning unit and a driver who
19 becomes dehydrated to the point of losing consciousness.
20 Those two factors are both entirely preventable, aren't
21 they, sir?
22     A   So he -- if, again, we assume that he got
23 dehydrated to the point of losing consciousness, if.
24     Q   Yes.  And, in part, his dehydration was
25 brought about by a poorly functioning air conditioner,

Page 63

1  you would agree with me that both of those things are
2  entirely preventable by the company and/or the driver?
3      A   Again, given all -- if -- if the loss of
4  consciousness is caused by dehydration, then, yes.
5      Q   All right.  Can you show us -- it's going to
6  be difficult, I don't know if you have the wherewith all
7  or not to share your screen.  It sounds like you have
8  paper documents there.
9          Can you show us, if you have to hold it up to
10 your camera, that's fine.  But I want to see breaks that
11 this gentleman took in the five hours before his
12 collision.
13         All right.  Now, I have seen that document in
14 a colored form.  Down at the bottom of that page, sir,
15 is there a Bates stamp, a control number in the bottom
16 right corner?
17     A   It says Report Time, there is a time stamp
18 here.
19     Q   I am looking in the bottom right corner.  Is
20 there a control number there?
21     A   Bottom right corner, it's a page, it's not a
22 control number.
23     Q   Okay.  But the date of that log is the date of
24 the accident?
25     A   The date is August 8th.

Page 64

1      Q   Okay.  Can you take us through -- let's work
2  our way backwards.  When was the last time that truck --
3  as I understand it, the logs -- you can put the exhibit
4  down now.  As I understand it, the logbooks are largely
5  electronic; agreed?
6      A   They are all electronic.
7      Q   And as Mr. Milanovic explained in his
8  deposition, a truck rolling down the road, it being in
9  motion, results in what entry on the log?  What's the
10 magic language on the log that tells you that the truck
11 is in motion?
12     A   Driving time.
13     Q   Driving time, okay.  And if the truck is not
14 in motion for how many minutes before it changes to
15 another term?
16     A   It's a new vers -- it's a new model.  So it's
17 not even in minutes, it's literally -- maybe not in a
18 second, but within one minute.
19     Q   Within one minute, okay.  For purposes of our
20 analysis here, we will just say within one minute.
21 Okay?  So when is the last time before this collision
22 this truck was not in motion or under the category
23 driving time?
24     A   Okay.  Just a second.
25     Q   I am looking for two things, when and where.