# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RANDY LUNDY,<br><br>  Plaintiff,<br>v.<br>HL MOTOR GROUP, INC., HIGHLIGHT MOTOR FREIGHT USA, INC., OLD REPUBLIC INSURANCE COMPANY, AND OGNJEN MILANOVIC,<br><br>  Defendants. | Case No.: CIV-22-699-F |
| FARMERS MUTUAL FIRE INSURANCE COMPANY OF OKARCHE,<br><br>  Plaintiff,<br>v.<br>HL MOTOR GROUP, INC. and OGNJEN MILANOVIC,<br><br>  Defendants. | Case No.: CIV-22-752-F |

**PLAINTIFF FARMERS MUTUAL FIRE INSURANCE COMPANY OF OKARCHE'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

s/ Matthew C. Kane
Gerard F. Pignato, OBA No. 11473
Matthew C. Kane, OBA No. 19502
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
(405) 239-6040; (405) 239-6766 FAX
jerry@ryanwhaley.com
mkane@ryanwhaley.com

*Attorneys for Plaintiff, Farmers Mutual Fire Insurance Company of Okarche*

# **TABLE OF CONTENTS**

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ............................................. 1

ADDITIONAL MATERIAL FACTS PREVENTING SUMMARY JUDGMENT IN DEFENDANTS' FAVOR ................................................................................................. 5

ARGUMENT AND AUTHORITIES ................................................................................ 11

    I.       Defendants are Plainly Negligent, and Defendants Cannot Establish the Sudden Emergency Defense ............................................................................ 11

    II.      Even if the Collision was the Result of Dehydration, Defendants are Undisputedly Negligent .................................................................................. 15

CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

**CASES**

*Bowers v. Wimberly*,
    933 P.2d 312, 1997 OK 24 .................................................................................... 11

*Dirickson v. Mings*,
    910 P.2d 1015, 1996 OK 2 ............................................................................... 11, 15

*CTC, Inc. v. Schneider Nat'l Inc.*,
    CIV-20-1235-F, 2021 WL 5815833 (W.D. Okla. Dec. 7, 2021) ............................... 11

*Morris v. Crete Carrier Corp.*,
    CIV-04-888-T, 2006 WL 8436330 (W.D. Okla. Jan. 20, 2006) .............................. 14

*Wallace v. Ormsby Trucking, Inc.*,
    CIV-04-1312-R, 2006 WL 8436367 (W.D. Okla. Sept. 11, 2006) .......................... 15

Plaintiff Farmers Mutual Fire Insurance Company of Okarche ("FMFICO") respectfully responds and objects to Defendants' Motion for Summary Judgment and Brief in Support (Doc. 25). Among the other reasons to deny Defendants' Motion, Defendant HL Motor Group ("HL") expressly admits that it was ***"not possible"*** for Defendant Ognjen Milanovic to have lost control due to dehydration, a wholly foreseeable event, and the only theory advanced by Defendants to avoid liability.

### RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1. Admitted.

2. Admitted.

3. Admitted.

4. Denied to the extent Defendants contend they "denied all material averments" as the Answers, cited by Defendants reveal a number of relevant admissions.

5. Admitted as to the content of the cited portions of Defendant Milanovic's testimony only. Summary judgment should be granted where Defendant can only provide his own uncorroborated testimony.[1] Moreover, Defendant Milanovic goes on to state he

---

[1] *Gary Family Tr. ex rel. Gary v. Gary*, CIV-20-618-G, 2020 WL 7138629, at *4 (W.D. Okla. Dec. 7, 2020) (remanding case because "Defendants rely almost entirely on the self-serving testimony of Steve for the proposition that the alleged malfeasance…Defendants submit no evidence to corroborate Steve's testimony."); *Sable v. City of Nichols Hills*, CIV-03-643-W, 2007 WL 9724195, at *10 (W.D. Okla. Nov. 6, 2007) ("Sable has not presented any facts at this stage that are sufficient to create a jury question; he has relied solely on his own self-serving testimony, which lacks any independent factual support in the record…"); *Tucker v. Franciscan Villa, Inc.*, 06-CV-0312-CVE-FHM, 2007 WL 2703194, at *8 (N.D. Okla. Sept. 17, 2007) (granting summary judgment where plaintiff "provides no evidence-other than her self-serving testimony-to support her assertion."); *Darrell Harris, Inc. v. United States*, 770 F. Supp. 1492, 1498 (W.D. Okla. 1991) (granting summary judgment in part on the fact that "there is no evidence…except for the conclusionary, self-

cannot remember driving on the Turner Turnpike, the accident, or anything until hours later at the hospital. Deposition of Ognjen Milanovic, **EXHIBIT 1**, 54:15-55:6.  He also testifies that "I vaguely remember that day whatsoever." *Id.,* 72:22-25. He cannot remember whether he lost consciousness before or after impacting the houses. *Id.,* 66:5-12. However, he subsequently recalls that he was looking for a good place to pull over because he was legally required to take a break. *Id.,* 94:1-13. He also recalls conversations with police, doctors and/or paramedics. *Id.,* 70:7-71:1; 74:4-15. And he recalls enough to deny that he went to sleep. *Id.,* 73:17-20. *See also,* contradictory statements in Material Fact No. 7.

6.   Admitted as to the content of the cited portions of Defendant Milanovic's testimony only. To the extent Defendants are contending that the purported loss of consciousness was the result of dehydration, such a condition was wholly foreseeable and preventable by simply drinking sufficient fluids. *See* Additional Facts, 1-11; *see also,* Response to Material Fact No. 5.

7.   Admitted as to the content of the cited portions of Defendant Milanovic's testimony only. In addition, such contentions expressly contract Defendant's Material Fact No. 5. *See also,* Response to Material Fact No. 5.

---

serving testimony of Harris"); *Fox v. Fox*, 2017 OK CIV APP 17, ¶ 12, 391 P.3d 124, 128 ("Thomas is seeking to avoid summary judgment by "creating" an issue of fact with his self-serving testimony. Further, Thomas's testimony is not uncontroverted or otherwise supported by the record. Thomas's testimony is the only evidence in this record suggesting that Tim did not have probable cause to file the federal court litigation."); *Kester v. Disan Eng'g Corp.*, 1979 OK CIV APP 5, 591 P.2d 344, 346 ("The only evidence in the record to support such a conclusion is the self-serving testimony of Brown…at best, is speculative and shows he was not sure what type of tenancy existed.").

8. Admitted as to the content of the cited portions of Defendant Milanovic's testimony only. Defendant Milanovic also testified that he believes that "maybe" the paramedics told him he was "unconscious before it happened" and "maybe" police told him that he was "stooped over at the wheel." **EXHIBIT 1**, 69:25-70:13. Defendants present no evidence that the paramedics or police made such statements at the hospital. *See also,* Response to Material Fact No. 5.

9. Denied. Defendants cannot both contend that Defendant Milanovic does not have any recollection whatsoever while also that he was not asleep at the wheel. Defendant Milanovic also testified that he believes that "maybe" the paramedics told him he was "unconscious before it happened" and "maybe" police told him that he was "stooped over at the wheel." **EXHIBIT 1**, 69:25-70:13. Trooper Linzy notes that "Mr. Milanovic told me that he did not recall the accident. He did not say anything about blacking out." Affidavit of Trooper Wayne Linzy, attached as **EXHIBIT 7.** Defendants present no evidence that the paramedics or police made such statements at the hospital.

10. Denied. David J. Fletcher's testimony is not uncontradicted nor is it sufficient even if uncontradicted to support summary judgment here. The records upon which Defendants' expert rely indicate that the key lab results cited by the expert are barely outside the "normal range" and others are within the normal range that should not be in cases of dehydration. Medical Records, **EXHIBIT 2**. More specifically, potassium levels are 3.4 L, and standard is 3.5 L. *Id.* Chloride is 96 L while standard is 97 L. *Id.* Despite Fletcher's representation in both his report and affidavit that Defendant Milanovic's urine specific gravity was "1.40," Fletcher Report, **EXHIBIT 3**, Fletcher Affidavit, Doc. 25-6, it

3

was actually 1.04, just .01 above the standard range. Meanwhile, BUN, creatine and eGFR levels (all indicators of dehydration) remain within standard range. **EXHIBIT 2;** National Kidney Foundation, https://www.kidney.org/blog/ask-doctor/can-dehydration-cause-creatinine-rise-if-so-what-factor; Mayo Clinic Blood Urea Nitrogen (BUN) Test, https://www.mayoclinic.org/tests-procedures/blood-urea-nitrogen/about/pac-20384821, **EXHIBIT 4**. Dr. Fletcher never examined Defendant Milanovic. **EXHIBIT 3**. He never tested Defendant Milanovic. *Id.* He never ascertained what Milanovic's own standard levels are. Report. *Id.* He never considered whether sleep or distraction was a more likely cause, relying exclusively on Milanovic's testimony rather than medical analysis. *Id.* Regardless, Dr. Fletcher's report is wholly contradicted by Defendant HL's corporate witness testimony, wherein HL admits that it is ***not possible*** for Defendant Milanovic to have been dehydrated. HL Corporate Representative Deposition, **EXHIBIT 5**, 56:18-57:9.

11. Admitted as to the content of the cited portions of Dr. Fletcher's affidavit only. Regardless, Dr. Fletcher's affidavit and report are wholly contradicted by Defendant HL's corporate witness testimony, wherein HL admits that it is ***not possible*** for Defendant Milanovic to have been dehydrated. **EXHIBIT 5**, 56:18-57:9. *See also,* Response to Material Fact 10.

12. Admitted as to the content of the cited portions of Dr. Fletcher's affidavit only. Regardless, Dr. Fletcher's affidavit and report are wholly contradicted by Defendant HL's corporate witness testimony, wherein HL admits that it is ***not possible*** for Defendant Milanovic to have been dehydrated. **EXHIBIT 5**, 56:18-57:9. *See also,* Response to Material Fact 10.

13. Admitted as to the content of the cited portions of Dr. Fletcher's affidavit only. Regardless, Dr. Fletcher's affidavit and report are wholly contradicted by Defendant HL's corporate witness testimony, wherein HL admits that it is ***not possible*** for Defendant Milanovic to have been dehydrated. **EXHIBIT 5**, 56:18-57:9. *See also,* Response to Material Fact 10.

## ADDITIONAL MATERIAL FACTS PREVENTING SUMMARY JUDGMENT IN DEFENDANTS' FAVOR

1. HL cannot affirmatively testify as to the cause of the accident. **EXHIBIT 5**, 33:13-35:12. However, HL expressly rejects dehydration as a potential cause:

> Q …you do not believe that he succumbed to dehydration, to the extent that he lost consciousness and ran off the roadway; right?
> A I don't believe that he succumbed to, specifically to the reason of dehydration.
> Q Okay.
> A Because of dehydration.
> Q You believe that makes no practical sense to you?
> A Correct.
> Q As the safety manager and/or vice-president of safety for this company for some eight plus years; right?
> A I think practically he took a rest break of forty-five minutes, which is more than enough for him to drink water, eat properly. And I don't believe that he taking rest -- that rest break, wouldn't be able to do it.
> Q Would common sense, and I know you are not a medical doctor, but would common sense, if dehydration was the medical condition that caused him to lose consciousness, if that's true, okay, do you believe, in your experience in life and as the safety manager for this company, that it's possible for a person to succumb to dehydration at such a fast rate, that the very first sign of a problem was the loss of consciousness?
> A Sir, for all of my experience, and I think I've had a relatively large experience with a large number of accidents, I never, ever observed weakness that dehydration played any such role.
> Q In causing a driver to lose consciousness and have a collision?
> A Yes.
> Q All right. And you make a good point. I mean, you've probably investigated hundreds of accidents, a thousand or more?

> A   I don't know the exact number. But from my experience, I knew cases where drivers were able to travel with not working AC and they were able to travel large distances. And it didn't lead to the loss of -- their ability to operate commercial vehicle was not impaired to such -- to such a level, where they lost consciousness and lost control of their vehicle.
> Q   Well, you make me pause and ask this, then.  You are telling me that you have seen situations where drivers operate on hot days with not fully functioning air-conditioning units.
> A   Yeah.
> Q   And, yet, that didn't lead to, wasn't a contributing cause, to the collision, is that what you are telling us?
> A   Yes.

*Id.,* 58:4-60:5.

> A   My explanation is that, specifically in case of Ognjen Milanovic, looking at his logbook, took a restroom break three hours before the accident, it's not -- it's not possible in his situation, because he had three hours before that took a rest break of forty-five minutes, as I see on his logbook. And for me, three hours of driving is not enough to get to such a level of dehydration, that he would be able to lose control, lose consciousness, lose control of his vehicle. 3 Maybe in some other case it's plausible, with some other guy, who probably, possibly drove without the rest break, not three hours, but let's say, I don't know, fifteen hours. But in his case, in his specific case, where we know exactly that he took a break three hours before the accident, that is not plaus -- it's not possible.

*Id.,* 56:18-57:9.

2.   HL admits that its drivers are responsible for ensuring they are hydrated at all times to avoid any negative health consequences of dehydration, that might impair the ability to drive.  **EXHIBIT 5**, 51:13-17.

3.   HL admits that Milanovic could have prevented any dehydration that could have occurred.

> Q   All right. And do you agree that an extreme level of dehydration would be a preventable circumstance by the driver?
> A   I would agree.

6

> Q  If a person had dehydration to the extent that they lost consciousness, you would agree that would be preventable by the truck driver?
> A  I would agree.

**EXHIBIT 5**, 49:18-24.

> Q  That's my question to you. If the driver becomes dehydrated and that's the reason he lost consciousness, that is a self-induced medical condition; agree?
> A  Agree.
> Q  Entirely preventable by the driver?
> A  Absolutely preventable.

*Id.,* 53:7-13.

> Q  So if a driver is feeling fatigued or dizzy due to dehydration, brought about by the absence of fluids and/or the rising temperatures in his truck, those are preventable factors; correct?
> A  Correct.

*Id.*, 53:22-54:4.

4. Milanovic admits that an accident resulting from dehydration was something preventable and under his control.

> Q  If you're fatigued and dehydrated, I suppose you could pass out and lose consciousness, right?
> A  Yes.
> Q  But fatigue and dehydration would be something within your control. You agree with that?
> A  Sure.

Defendant Milanovic's Deposition, **EXHIBIT 1**, 114:14-20.

> Q  Okay. Well, I'm just trying to figure out, are -- are you saying you were not feeling fatigued or you were not dehydrated, or are you simply saying you don't recall feeling either of those things?
> A  I don't -- if I had felt that, which I have in the past, I would have done something about it, but I don't remember feeling that.

*Id.,* 116:13:19.

7

5. Both defendants agree that fluids were easily available to Milanovic.

> Q  Regarding your practices, would -- would it be your practice -- if you -- if you pulled over to get something to drink, would -- would it be your practice to buy, like, I don't know, a case of water, a case of Gatorade, a –
> A  Yeah. Yeah. Always. Always. There's some on the side, so, yeah, always. How many depends on the day, you know.

**EXHIBIT 1**, 110:9-16.

> A  I think practically he took a rest break of forty-five minutes, which is more than enough for him to drink water, eat properly. And I don't believe that he taking rest -- that rest break, wouldn't be able to do it.

**EXHIBIT 5**, 58:17-21.

6. Milanovic states that the air-conditioning in the semi was not working properly. **EXHIBIT 1**, 111:17-23.

7. Milanovic did not report the faulty air-conditioning. **EXHIBIT 5**, 62:2.

8. Milanovic admits that it was his "job" to stay hydrated while he drove. **EXHIBIT 1**, 112:14-25.

9. Milanovic admits it is not safe to drive without air-conditioning in hot temperatures and that he should have pulled over.

> Q  And that if it's not safe to drive because you're dehydrated or because your equipment lacks sufficient air conditioning, it's your job to pull over until those situations can be remedied, right?
> A  I would agree with you there.
> Q  All right. You can't just keep driving if you're dehydrated or hot and tired. You understand that?
> A  Yes.
> Q  Because if you do, accidents like this can happen. Agree?
> A  Agree.

**EXHIBIT 1**, 112:14-25.

8

10. HL admits it could have repaired the air-conditioner. **EXHIBIT 5**, 53:21-24. ("Q: Okay. You agree with me, that would also be a preventable factor; right, sir?  A: In terms of repair of conditioner, yes.").

11. HL is responsible for ensuring operating air-conditioning in its vehicles and that it is unacceptable for a driver to operate such a vehicle in excessive temperatures.

> Q   All right. So is HL responsible for ensuring that the AC units in its big rigs are functioning properly?
> A   Correct.

**EXHIBIT 5**, 61:5-8.

> Q   All right. Is it -- is it acceptable to HL, that a driver from northern climates, on his very first trip for HL into the south in the hot summer months, drove ten plus hours on a ninety plus degree day with a poorly performing air-conditioning unit in his truck and did not report that to the company?
> A   Yeah. That's -- that's not acceptable.

*Id.,* 62:13-19.

12. The Official Oklahoma Traffic Collision Report, attached as **EXHIBIT 6,** provides:

> PRE-IMPACT THERE IS NO EVIDENCE OF BRAKING OR OPERATOR INPUT. POST IMPACT, ABOUT THE REAR OF 3716 CATAMARAN DR, THERE SEEMS TO BE BOTH STEERING AND BRAKING INPUT. WITNESS STATES SHE SAW UNIT 1 LEAVE THE ROADWAY "AS IF IT WERE TAKING AN EXIT." UNIT 1 DRIVER STATES THAT HE DID NOT RECALL EVENTS PRIOR TO THE COLLISION, AND THAT HE HAS NO MEDICAL CONDITION THAT SHOULD HAVE CAUSED UNCONSCIOUSNESS. AFTER EVENT INSPECTION OF UNIT 1 BY TRP RAGLAND S729 DID NOT REVEAL ANY OBVIOUS MECHANICAL DEFECTS…UNIT 1 DRIVER LOG SHOWS DRIVER HAD BEEN ACTIVE FOR AT LEAST 9 HOURS. INVESTIGATION EVIDENCE POINT TO SLEEPY DRIVER.

As recounted by Trooper Linzy:

> Based on my investigation, I was able to determine that when Mr. Milanovic left the Kilpatrick Turnpike in his semi, he traveled down an embankment. The physical evidence demonstrated he slammed on his brakes. Still, the weight and momentum of his truck, combined with the steep downgrade made it virtually impossible for him to stop. He attempted to drive his truck between two houses. Unfortunately, the distance between the two houses was not enough to allow him to drive clearly between them so he clipped both houses on his way through.
>
> After years of accident investigation and studying human response, I can state that when a driver completely blacks out, he/she does not immediately come back to his/her normal cognitive state. A person who is passed out, whether that be induced by a stimulus, knock out by a punch, or medically, in my experience, has never popped up exactly where he/she was before he/she blacked out. They come back in a haze or in a fog. In my experience, when the driver falls asleep at the wheel, when he/she is shaken awake he/she comes back in a level of awareness that allows him/her to begin functioning appropriately.
>
> [I]f Mr. Milanovic had a medical episode, such as a heart attack, a seizure, a diabetic coma, he would not have awakened that quickly and regained his full senses.
>
> Based on my investigation of this accident, Mr. Milanovic made a conscious decision to steer his vehicle in an effort to avoid maximum damage. This was a prudent decision on his part, which again, puts high cognitive thinking into place versus someone who has passed out or who has had a medical episode. In that high cognitive thinking is this driver - Mr. Milanovic - steering for the gap.
>
> In my opinion, Mr. Milanovic simply fell asleep at the wheel.

**EXHIBIT 7.**

**ARGUMENT AND AUTHORITIES**

**I.   Defendants are Plainly Negligent, and Defendants Cannot Establish the Sudden Emergency Defense.**

It is undisputed that a driver owes a duty of care. "Concerning duty of care, a driver of a motor vehicle must, at all times, use that degree of care which is reasonable and prudent under the circumstances." *Dirickson v. Mings*, 1996 OK 2, 910 P.2d 1015, 1018; *CTC, Inc. v. Schneider Nat'l Inc.*, CIV-20-1235-F, 2021 WL 5815833, at *2 (W.D. Okla. Dec. 7, 2021) (quoting same). "Therefore, a failure to exercise that degree of care which results in injury to another is actionable negligence." *Id.* Milanovic drove off of the turnpike and collided with houses belonging to Lundy and Carr, while in his scope of employment for HL. DMF 1-4. Defendants' only option is to argue that an affirmative defense exists, which excuses Milanovic's conduct.

> Unavoidable accident by reason of sudden incapacitating illness or unconsciousness, ***if not foreseeable***, is a defense to negligence. In order for defendant to be relieved of liability for negligence based on this affirmative defense, the ***defendant must prove*** the sudden unconsciousness that caused the accident and that ***the attack was not foreseeable.*** *Parker v. Washington,* 421 P.2d 861, 866 (Okla.1966). Thus, the burden of proof is on the defendant to introduce affirmative proof of every element of his affirmative defense of unavoidable accident.

*Bowers v. Wimberly*, 1997 OK 24, 933 P.2d 312, 314 (emphasis added). Defendants advance their defense solely by way of a medical report submitted by Defendants' expert, contending, in wholly conclusory fashion, that Milanovic was dehydrated and consequently passed out at the time of the collision. DMF 10-13. However, the report fails to establish the requisite conditions for the defense.

Here, the report submitted by Defendants suffers from a number of defects. The determination is predicated on the thinnest of margins – i.e., Milanovic's potassium level is 3.4, one tenth below the normal range of 3.5 to 5.1 mEq/L and his chloride is 96, one mEq/L below the standard range. Response to DMF 10. It does not consider what Milanovic's "typical" labs are, thus preventing any determination of whether Milanovic's levels were abnormal for him on the day in question. *Id*. His creatinine and estimated glomerular filtration rate (eGFR) levels are well within the normal range, despite the fact that the former would be elevated and the latter below normal if the individual suffered from dehydration. *Id.* It makes no effort to rule out sleep as a cause, simply relying on Milanovic's testimony, which itself is entirely conflicting (i.e., he cannot remember anything, but he can conclude he did not fall asleep). Response to DMF 5, 9. Indeed, the physical evidence – that Milanovic he slammed on his brakes and attempted to drive his truck between two houses – establishes that Milanovic did, in fact, fall asleep, only to wake up when the truck went off the road. AF 12.

Defendants' reliance on Dr. Fletcher is no different than that of the defendant in *Bowers v. Wimberly*, 1997 OK 24, ¶ 12, 933 P.2d 312, 315, which the Supreme Court determined is insufficient for grant of summary judgment as a matter of law.

> The statements of the doctor in the case at bar about causation and foreseeability are not "uncontroverted facts." Dr. Love's affidavit goes beyond medical diagnosis and offers legal conclusions on foreseeability and causation. These are issues to be determined by the trier of fact. The affidavit gives the doctor's opinion that defendant suffered a stroke, but then goes on to attribute the stroke as the cause of the accident and to state that the stroke was unforeseeable. Had the doctor given the same conclusory testimony in a trial, the court could have disallowed the testimony on causation because there were not sufficient facts in evidence on which to base such an opinion.

12

*Id.* The Supreme Court continued:

> The Court of Civil Appeals would have required the plaintiff in this case to controvert the fact of the defendant's stroke. The plaintiff is required only to demonstrate that there are material facts in controversy, which was done in the case at bar. The plaintiff disputes the cause of the accident by offering, as evidence, the accident report containing plaintiff's statements to the Highway Patrol trooper at the scene of the accident, and attaching the trooper's second affidavit that stated for the first time that the trooper had observed that it seemed to him that Mr. Wimberly had a head injury. Having placed the cause of the accident in controversy by showing that reasonable persons could find that the stroke was not the cause of the accident, it was for the trier of fact to determine the cause of the accident. In *Dockum, supra,* the trial court had granted summary judgment to defendant car dealership because the plaintiff's materials attached in opposition to the motion for summary judgment did not contain evidence that would be admissible at trial. In reversing the trial court, we stated that "it is enough that these 'other materials' reasonably show the judge who is considering the motion that the party opposing the motion will be able at the time of trial to present competent admissible evidence to support the allegations." *Dockum* at 1081.

*Id.* Just as in *Bowers,* there is an accident report which provides direct evidence that the accident was the result of Milanovic's sleepiness rather than some other condition. AF 12. Just as in *Bowers,* Trooper Linzy's affidavit provides evidence establishing Milanovic fell asleep at the wheel. As a result, the *Bowers* court determined:

> Even if there is no controversy whether defendant suffered a stroke, there is a fact question as to when the stroke occurred and whether the stroke caused the accident. The plaintiff has had no opportunity to cross examine the doctor about his conclusions that the stroke was not foreseeable and that the stroke caused the accident. Neither has plaintiff been able to question the trooper about his belief that defendant suffered a head injury. The bare facts of the case show that there is conflicting evidence: the statement made after the accident and the doctor's affidavit are at odds. The disputed issue is whether there was negligence or unavoidable accident.
>
> It is not the province of the court to weigh the evidence, but merely to determine whether there is conflicting evidence. Here, there is conflicting evidence and we need not go further in order to find that the trial court erred

in granting summary judgment to defendants. We have said that it is not the purpose of summary judgment to substitute trial by affidavit for trial according to law, and that weighing of evidence must be left to the jury. *Stuckey v. Young Exploration Co.,* 586 P.2d 726, 730 (Okla.1978). The result in the case at bar is trial by affidavit.

*Id.* at 315-16.

Similarly, in *Morris v. Crete Carrier Corp.*, CIV-04-888-T, 2006 WL 8436330, at *2 (W.D. Okla. Jan. 20, 2006), Judge Thompson opined:

[W]hile Defendants have submitted evidence that Mr. Gentry was unaware that he had the condition of hypertrophic cardiomyopathy prior to his death and had not had the test necessary to diagnose that condition, an echocardiogram…this evidence is insufficient to show a necessary element of the defense of unavoidable accident due to a sudden medical event—that the attack of sudden unconsciousness was unforeseeable or that Mr. Gentry was not aware of any condition he had which rendered him subject to an attack of unconsciousness. *See Bowers v. Wimberly*, 933 P.2d 312, 314 (Okla. 1997); *Parker*, 421 P.2d at 866. Thus, the Court concludes that Defendants failed to meet their initial burden of submitting evidence establishing the essential elements of their affirmative defense and showing the absence of genuine issues of material fact concerning that defense.

The report here similarly fails to establish that Milanovic did not fall asleep, that he was not distracted or that complete unconsciousness as the result of dehydration was unforeseeable.

Dehydration, the only condition advanced by Defendants' expert, is wholly foreseeable and preventable. Drinking fluid prevents dehydration. Failure to drink sufficient fluids, especially in warm conditions, leads to dehydration. Milanovic and HL both expressly acknowledge that dehydration is something that was completely under Milanovic's control. AF 3-4. Milanovic admit he should not continue to drive if he is dehydrated. AF 8-9. Both acknowledged the availability of fluids to prevent dehydration.

14

AF 5. Milanovic even testified that he had been dehydrated before but did not have any such symptoms at the time of the accident. AF 4. In short, Defendants cannot possibly establish that dehydration was an unforeseeable cause of an accident, as required for the proffered defense.

Regardless, HL's own admission fatally contradicts the report. HL, through its corporate representative, expressly stated that it was "***not possible***" for Milanovic to be dehydrated at the time of the collision. AF 1 ("I don't believe that [Milanovic] succumbed to, specifically to the reason of dehydration."). No medical report can overcome a party's own express admission.

## II. Even if the Collision was the Result of Dehydration, Defendants are Undisputedly Negligent.

Assuming (despite evidence and testimony to the contrary) that Milanovic did suffer from dehydration leading to the collision, Defendants have still acted negligently to cause the damage to the homes.

> Under Oklahoma law, proximate cause is defined as that which, in the natural and continuous sequence, produces the plaintiff's injury, and without which the injury would not have happened. *Dirickson v. Mings*, 910 P. 2d 1015, 1018–1019 (Okla. 1996); *Tomlinson v. Love's Country Stores*, 854 P. 2d 910, 916 (Okla. 1993). An injury may have more than one proximate cause. *Kirkpatrick v. Chrysler Corp.*, 920 P. 2d 122, 126 (Okla. 1996). Multiple defendants may be liable as joint tortfeasors if each defendant's negligence is found to be a proximate cause of a plaintiff's injury. *Woolard v. JLG Industries, Inc.*, 210 F. 3d 1158 (10th Cir. 2000).

*Wallace v. Ormsby Trucking, Inc.*, CIV-04-1312-R, 2006 WL 8436367, at *3 (W.D. Okla. Sept. 11, 2006). Here, adopting for argument's sake, Defendants' theory that Milanovic

15

passed out from dehydration prior to the collision, two related actions (or lack thereof) of Defendants were the cause of the collision.

Defendant Milanovic states that the air-conditioning in the semi was not working. AF 6. HL acknowledges that it is responsible for the air-conditioning in its trucks. AF 10-11. HL also agrees it is responsible for Milanovic's negligence in the scope of his duties. AF 2. Milanovic did not report the air-conditioning issue to HL, something that is simply unacceptable. AF 7. The air-conditioner could have been repaired. AF 10. The purported dehydration was due to a "heat-related illness." UMF 5. In short, Defendants have admitted all the necessary elements to establish that the failure to report/repair the air-conditioner, and continuing to drive in hot temperatures without air-conditioning were negligent acts in and of themselves. As a result, summary judgment in Plaintiff's favor is appropriate.

Moreover, regardless of the responsibility for reporting and repairing the air-conditioner, dehydration arising from insufficient fluid intake was a wholly foreseeable and preventable condition. AF 3-4. HL admits that its drivers are responsible for ensuring they are hydrated at all times to avoid any negative health consequences of dehydration, that might impair the ability to drive. AF 2. HL admits that Milanovic could have prevented any dehydration that could have occurred. AF 3. Milanovic admits that an accident resulting from dehydration was something preventable and under his control. AF 4. Both defendants agree that fluids were easily available to Milanovic. AF 5. In short, Defendants admit dehydration from lack of fluids was wholly foreseeable and wholly preventable. Nonetheless, assuming Milanovic failed to stay hydrated, he was clearly negligent and thus his negligent acts are imputed to his employer.

## CONCLUSION

For the reasons set forth herein, Plaintiff Farmers Mutual Fire Insurance Company of Okarche requests the Court deny Defendants' Motion for Summary Judgment.

                        Respectfully submitted,

                        s/ Matthew C. Kane
                        GERARD F. PIGNATO, OBA No. 11473
                        MATTHEW C. KANE, OBA No. 19502
                        **RYAN WHALEY**
                        400 North Walnut Avenue
                        Oklahoma City, Oklahoma 73104
                        (405) 239-6040
                        (405) 239-6766 FAX
                        jerry@ryanwhaley.com
                        mkane@ryanwhaley.com

                        *Attorneys for Plaintiff*
                        *Farmers Mutual Fire Insurance Company*
                        *Of Okarche*

## **CERTIFICATE OF SERVICE**

      ☑    I hereby certify that on June 19, 2023, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

    Michael T. Franz, Esquire
    Jeremy K. Schrag, Esquire
    Rodney Stewart, Esquire

                        /s/ Matthew C. Kane
                        For the Firm