# EXHIBIT 3

1806 N. Market Street
Champaign, IL 61822





March 27, 2023

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RANDY LUNDY, | |
| Plaintiff, | |
| | Case No.: CIV-22-699-F |
| v. | |
| HL MOTOR GROUP, INC., HIGHLIGHT MOTOR FREIGHT USA, INC., OLD REPUBLIC INSURANCE COMPANY, AND OGNJEN MILANOVIC, | |
| Defendants. | |

| | |
|---|---|
| FARMERS MUTUAL FIRE INSURANCE COMPANY OF OKARCHE, | |
| Plaintiff, | |
| | Case No.:  CIV-22-752-F |
| v. | |
| HL MOTOR GROUP, INC. and OGNJEN MILANOVIC, | |
| Defendants. | |



📞 217.351.3116
🖨 217.305.6764
www.217immediatecare.com





📞 217.356.6150
🖨 217.356.7167
www.safeworksillinois.com





## I.   RETENTION ASSIGNMENT

On January 31, 2023 this commercial driver medical fitness expert was retained by counsel for defendants to render opinions concerning the medical qualifications and fitness for duty of Ognjen Milanovic born on 7/30/1984, as a commercial motor vehicle driver,

I was asked to review:

1. Mr. Milanovic's medical history and his health status to operate a company vehicle on the date of his last commercial vehicle driver medical examination before the accident in question on 8/8/20.

2. Determine his fitness-for-duty at the time of the accident on 8/8/20 and his present fitness for driving.

3. Opine if Mr. Milanovic was medically qualified to drive when Highlight Motor Freight USA, Inc. Transportation USA, LLC  placed Milanovic behind the wheel of the 2017 Freightliner Cascadia at the time of the accident on 8/8/20.

## II.   EDUCATION, TRAINING AND EXPERIENCE

I am a physician licensed to practice medicine in the State of Illinois through July 2023. I am a medical doctor with dual-board certification in occupational and preventive medicine.

A copy of my current curriculum vitae is attached hereto, and made part of this report as **Exhibit A**.

Since 1995, I have been on the front lines evaluating medical fitness for Commercial Motor Vehicle (CMV) drivers on a national level.

I have published and spoken around the country on topics related to the medical fitness of commercial truck drivers.

In April 1995, I conceived and proctored the first ever national training program for physicians regarding Commercial Motor Vehicle (CMV) driver medical fitness through the development of a day-long training seminar sponsored by the American College of Occupational and Environmental Medicine (ACOEM), a training course that continues to the present.





In 1995, I initiated a national proposal outlining and mandating CMV medical certification examiner competency benchmarks. Some of the stipulations highlighted in my proposal subsequently garnered national acceptance and went into effect May 21, 2014, with the advent of the National Registry of Certified Medical Examiners (NRCME).[1]

In 1996, I was chosen as one of two physician representatives to serve on a national advisory panel for the **US Department of Transportation (DOT) Federal Highway Administration (FHWA)** with the overarching goal of developing new regulations, as well as merging the commercial driver's license (CDL) procedures with the physical qualifications necessary to obtain a CDL.

I have qualified as an expert regarding driver medical fitness in more than 60 cases around the United States, where I have given opinions as to whether or not driver fitness issues were a proximate cause of injury or an issue in a motor vehicle collision.

I have been retained by both plaintiff and defense counsel in trucking-related cases.

I have performed more than 20,000 **Commercial Driver Medical Exams (CDME)** exams in my career, and my private practice, **SafeWorks Illinois**, currently performs more than 1,000 CDME physicals per year for multiple motor carriers in Central Illinois. The medical office building I own abuts Interstate-74 Exit 182 in Champaign, IL and has the parking capacity for tractor-trailers.

I am intimately familiar with the **Federal Motor Carrier Safety Administration (FMCSA)** regulatory requirements (**FMCSRs**) for medical certification for commercial motor vehicle drivers as well as FMCSA advisory guidelines for determining fitness-for-driving.

I have been a certified FMCSA **Medical Review Officer (MRO)** for more than three decades. In addition, I am also a FMCSA certified **Substance Abuse Professional (SAP)**.

---

[1] Fletcher, DJ "Revamping the DOT Medical Certification Process: The Time Has Come" **Journal of Occupational Medicine**, April 1996, American Occupational Health Conference, San Antonio, Texas.





## III. <u>DOCUMENTS AND INFORMATION REVIEWED</u>

Before I prepared this expert report, I reviewed the following documents:

1. Complaint (Petition) filed in District Court of Canadian County, State of Oklahoma, August 4, 2022.

2. Complaint (Petition) filed in District Court of Canadian County, State of Oklahoma, July 20, 2022.

3. Affidavit of Insufficient Knowledge, August 29, 2022.

4. Pleadings:
   a. Defendants' Answer And Affirmative Defense To The Plaintiff's (Randy Lundy) Amended Complaint, Filed August 26, 2022
   b. Defendants' Answer And Affirmative Defense To The Plaintiff's (Farmers Mutual) Amended Complaint, Filed August 29, 2022
   c. Plaintiff's Final Witness List 3/1/2023
   d. Plaintiff, Farmers Mutual Fire Insurance Company of Okarche Answers to Defendants' Interrogatories, January 12, 2023
   e. Rule 26, Initial Disclosure of the Plaintiff, Farmers Mutual Fire Insurance Company of Okarche, November 21, 2022
   f. Rule 26, Disclosures, Stewart Law Firm, Attorney for Randy Lundy.

5. Official Oklahoma Traffic, Collision Report, Case #YEOO112-20.

6. Ambulance Records EMSA CAD Response Number 20177007.

7. Medical Records:
   a. OU Medical Records 8/8/20.

8. Employment Records (DQ file), including Ontario Class A Commercial Driver's License and medical report.

9. Federal DOT FMCSA five panel post-accident drug test result collected on 8/9/20 and results reported on  8/11/20.

10. Commercial Driver Medical Certificate/Documentation.





| DATE OF EXAM | LENGTH OF CERTIFICATION | EXAMINER | EXPIRATION DATE | COMMENT |
|---|---|---|---|---|
| 8/3/2020[2] | Not applicable | No examiner listed | He had to get an updated medical exam and report in January 2022 | |
| | | | | |

---

[2] Medical Declaration:

The United States and Canada entered into a Reciprocity Agreement, effective March 30, 1999, recognizing that a Canadian commercial driver's license is proof of medical fitness to drive a CMV. Therefore, Canadian CMV drivers are not required to have in their possession a medical examiner's certificate if the driver has been issued, and possesses, a valid commercial driver license issued by a Canadian Province or Territory, and whose license and medical status, including any waver or exemption, can be electronically verified. However, drivers who received a medical authorization that deviates from the mutually accepted compatible medical standards of the resident country are not qualified to-drive. a CMV in the other countries. For example, Canadian drivers who do not meet the medical fitness provisions of the Canadian Safety Code for Motor Carriers but are issued a waiver by one of the Canadian Provinces or Territories, are not qualified to drive in the United States.  The driver had a valid Ontario Commercial Driver's License which means he submitted a medical exam report that qualified him.

**Highlight 000480**





**Medical Declaration**

The United States and Canada entered into a Reciprocity Agreement, effective March 30, 1999, recognizing that a Canadian commercial driver's license is proof of medical fitness to drive a CMV. Therefore, Canadian CMV drivers are not required to have in their possession a medical examiner's certificate if the driver has been issued, and possesses, a valid commercial driver license issued by a Canadian Province or Territory, and whose license and medical status, including any waiver or exemption, can be electronically verified. However, drivers who received a medical authorization that deviates from the mutually accepted compatible medical standards of the resident country are not qualified to drive a CMV in the other countries. For example, Canadian drivers who do not meet the medical fitness provisions of the Canadian Safety Code for Motor Carriers but are issued a waiver by one of the Canadian Provinces or Territories, are not qualified to drive in the United States.

I, _____Ognjen  Milanovic_____, certify that I am physically qualified to drive a commercial motor vehicle in the United States and Canada, and further certify that:

A.  I have no loss of a foot, a leg, a hand, or an arm, or have been granted a skill performance evaluation certificate pursuant to §391.49;
B.  I have no impairment of:
    (i)    A hand or finger which interferes with prehension or power grasping; or
    (ii)   An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or has been granted a skill performance evaluation certificate pursuant to §391.49.
C.  I have no established medical history or clinical diagnosis of **diabetes mellitus** currently treated with insulin for control, unless meeting the requirements in §391.46;
D.  I have no current clinical diagnosis of **myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease** of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive cardiac failure;
E.  I have no established medical history or clinical diagnosis of a **respiratory dysfunction** likely to interfere with my ability to control and drive a commercial motor vehicle safely;
F.  I have no current clinical diagnosis of **high blood pressure** likely to interfere with my ability to operate a commercial motor vehicle safely;
G.  I have no established medical history or clinical diagnosis of **rheumatic, arthritic, orthopedic, muscular, neuromuscular, or vascular disease** which interferes with my ability to control and operate a commercial motor vehicle safely;
H.  I have no established medical history or clinical diagnosis of **epilepsy** or any other condition which is likely to cause **loss of consciousness** or any loss of ability to control a commercial motor vehicle;
I.  I have no **mental, nervous, organic, or functional disease or psychiatric disorder** likely to interfere with my ability to drive a commercial motor vehicle safely;
J.  I have distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70° in the horizontal Meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber;
K.  I have no impairment of **hearing**. (Driver first perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ASA Standard) Z24.5—1951.)
L.  I do not use any drug or substance identified in 21 CFR 1308.11 Schedule I, an amphetamine, a narcotic, or other habit-forming drug.
M.  I do not use any non-Schedule I drug or substance that is identified in the other Schedules in 21 CFR part 1308 except when the use is prescribed by a licensed medical practitioner, as defined in §382.107, who is familiar with the driver's medical history and has advised the driver that the substance will not adversely affect the driver's ability to safely operate a commercial motor vehicle.
N.  I have no current clinical diagnosis of alcoholism.

I further agree to and confirm my responsibility to inform my employer should my medical status change, or if I can no longer certify conditions A to N, as described above.

Driver's name    Ognjen  Milanovic          Signature _____

Witness: _____          Date:  3   Aug   2020

*Figure 1 Milanovic's 8/4/20 Medical Declaration*





11. Depositions:

| Depositions | Date of Dep | Relationship | Pages | # of Exhibits |
|---|---|---|---|---|
| Ognjen Milanovich | March 15, 2023 | Defendant Driver | 126 | 14 exhibits including crash photos, Electronic Hours of Service records, crash report |
| | | | | |
| | | | | |

## IV. STANDARDS, REGS, & APPLICABLE FMCSA & CANADIAN MEDICAL GUIDELINES

Motor Carrier Industry Standards and relevant Federal Motor Carrier Safety Act Regulations (FMCSRs) as well as Interpretations to the FMCSRs apply to both as an industry standard and legal standard because the state of **Oklahoma** has adopted the FMCSRs as their own.

The Federal Motor Carrier Safety Administration (FMCSA) is focused on reducing crashes, injuries, and fatalities involving large trucks and buses. Determining driver medical fitness for duty is a critical element of FMCSA safety programs.

In carrying out its safety mandate to reduce crashes, injuries, and fatalities involving large trucks and buses, FMCSA develops and enforces data-driven safety regulations that balance motor carrier (truck and bus companies) safety with industry efficiency.

The mission of the FMCSA Office of Medical Programs is to promote the safety of America's roadways through the promulgation and implementation of medical regulations, guidelines and policies that ensure commercial motor vehicle drivers engaged in interstate commerce are physically qualified to do so.

Below is a brief outline of the FMSCRs that are pertinent in deciding on Mr. Milanovic's fitness for duty at the time of the accident on August 08, 2020. These regulations were used by this author as the support to opine whether Highlight Motor Freight USA, Inc. had placed a commercially qualified and medically fit driver on the road.





The purpose of these rules is to help reduce or <u>prevent truck accidents, fatalities,</u> and injuries by requiring safe drivers and <u>disqualifying unsafe drivers</u>.  383.1(a)

Persons <u>must not operate</u> a CMV unless <u>*physically*</u> qualified to do so**.** 391.11(a); 391.41(a)(1)(i); 391.41(a)(3)(i);

**§**391.41 <u>Physical qualifications for drivers.</u>  (a)(1)(i) A person subject to this part must not operate a commercial motor vehicle unless he or she is medically certified as physically qualified to do so, **and**,

(3) A person is physically qualified to drive a commercial motor vehicle if: (i) That person meets the physical qualification standards in paragraph (b) of this section and has complied with the medical examination requirements in §391.43;

The section §391.41 "Physical qualifications for drivers" contains the word <u>and</u> meaning "both." Thus, the motor carrier has to ensure that the driver is physically qualified (there is a list of 12 physical requirements) **and** passed a valid medical exam.

Section §391.41 contains specific physical qualification standards that determine an individual's fitness to operate a commercial motor vehicle. In this specific case, the focus is on FMCSA regulations and guidance regarding diabetes mellitus and hypertension guidelines.

Furthermore, §391.45 - Medical Examination; Certificate of Physical Examination; Persons Who Must Be Medically Examined and Certified; mandates Fitness-for-Duty exams for any CMV driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease in between CDME periodic examinations[3]

The United States and Canada entered into a Reciprocity Agreement, effective March 30, 1999, recognizing that a Canadian commercial driver's license is proof of medical fitness to drive a CMV. Therefore, Canadian CMV drivers are not required to have in their possession a medical examiner's certificate if the driver has been issued, and possesses, a valid commercial driver license issued by a Canadian Province or Territory, and whose license and medical status, including any waver or exemption, can be electronically verified. However, drivers who received a medical authorization that deviates from the mutually accepted compatible medical standards of the resident country are not qualified to-drive a CMV in the other countries. For example, Canadian drivers who do not meet the medical fitness provisions of the Canadian Safety Code for Motor Carriers but are issued a waiver by one of the Canadian Provinces or Territories, are not qualified to drive in the United States.

---

[3]      Fletcher, DJ.  Fitness for Duty Examinations Fitness for Duty Exams-- A Powerful Tool to Offer Employers, Visions the Periodical of the National Association of Occupational Health Professionals Volume 27 No 4 Summer 2017:8-96.





FMCSA has published on its website guidelines on the medical fitness of Canadian drivers[4]:

 https://www.fmcsa.dot.gov/international-programs/medical-qualification-requirements

Ontario has published several on-line resources regarding medical fitness of drivers:

https://www.cvsa.org/wp-content/uploads/Inspection-Bulletin-2016-01-Canadian-Licenses-Medical-Certification.pdf

https://www.ontario.ca/page/medical-vision-and-hearing-standards-commercial-drivers

§382.101   Purpose.

The purpose of this part is to establish programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles.

§382.303   Post-accident testing.

(a) As soon as practicable following an occurrence involving a commercial motor vehicle operating on a public road in commerce, each employer shall test for alcohol for each of its surviving drivers:

(1) Who was performing safety-sensitive functions with respect to the vehicle, if the accident involved the loss of human life; or

(2) Who receives a citation within 8 hours of the occurrence under State or local law for a moving traffic violation arising from the accident, if the accident involved:

(i) Bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or

(ii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle.

---

[4] **Q1:  Do all Canadian drivers need to carry the medical certification when driving a CMV in the United States?  A1:**  No, only Canadian Class 5, Alberta Class 3, New Brunswick Class 3 and Ontario Classes D and G Canadian CMV drivers are required to carry proof of medical qualifications when operating in the United States.  A CMV operator from Canada or Mexico who has been issued a valid commercial driver's license by a Canadian Province or the Mexican Licencia Federal is no longer required to have a medical certificate. The driver's medical exam is part of the driver's license process and is proof of medical fitness to drive in the United States. However, Canadian and Mexican drivers  who have epilepsy or who are hearing-and-vision impaired are not qualified to drive CMVs in the United States. Furthermore, Canadian drivers who do not meet the medical fitness provisions of the Canadian National Safety Code for Motor Carriers but who have been issued a waiver by one of the Canadian Provinces or Territories are not qualified to drive CMVs in the United States.





(b) As soon as practicable following an occurrence involving a commercial motor vehicle operating on a public road in commerce, each employer shall test for controlled substances for each of its surviving drivers:

(1) Who was performing safety-sensitive functions with respect to the vehicle, if the accident involved the loss of human life; or

(2) Who receives a citation within thirty-two hours of the occurrence under State or local law for a moving traffic violation arising from the accident, if the accident involved:

(i) Bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or

(ii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle.

(c) The following table notes when a post-accident test is required to be conducted by paragraphs (a)(1), (a)(2), (b)(1), and (b)(2) of this section:

### TABLE FOR §382.303(A) AND (B)

| Type of accident involved | Citation issued to the CMV driver | Test must be performed by employer |
|---|---|---|
| i. Human fatality | YES<br>NO | YES<br>YES |
| ii. Bodily injury with immediate medical treatment away from the scene | YES<br>NO | YES<br>NO |
| iii. Disabling damage to any motor vehicle requiring tow away | YES<br>NO | YES<br>NO |

The role of a certified medical examiner is essential for correct determination of a driver's fitness and overall ability to safely drive on the roadways.





**391.43   Medical examination; certificate of physical examination.**

(a) Except as provided by paragraph (b) of this section, the medical examination must be performed by a medical examiner listed on the National Registry of Certified Medical Examiners under subpart D of part 390 of this chapter.

(b) Exceptions:

(1) A licensed optometrist may perform so much of the medical examination as pertains to visual acuity, field of vision, and the ability to recognize colors as specified in paragraph (10) of §391.41(b).

(2) A certified VA medical examiner must only perform medical examinations of veteran operators.

(c) Medical examiners shall:

(1) Be knowledgeable of the specific physical and mental demands associated with operating a commercial motor vehicle and the requirements of this subpart, including the medical advisory criteria prepared by the FMCSA as guidelines to aid the medical examiner in making the qualification determination; and

(2) Be proficient in the use of and use the medical protocols necessary to adequately perform the medical examination required by this section.

Certified medical examiners are versed in what risk factors to look for when an individual presents for a DOT medical examination. The FMCSA relies on medical examiners to make driver qualification decisions based on their clinical observations, findings, and standards of practice.

In the US, the length of certification and overall decision of whether to pass or fail a driver lies with the certified medical examiner. If the examiner determines that the driver does meet the medical standards, the examiner can certify the driver for any duration; 2 years, 1 year, or offer a "short card" for 30, 60, or 90 days. The examiner determines length of certification and as appropriate and may issue more than one 3-month certification in a row. If a medical examiner determines a driver is not qualified, they must select does not meet standards and not certify. If a driver is placed in determination pending, they may continue to driver with their prior certificate up until it expires or if the determination decision changes.

The overall guidance for giving a card less than 2 years is explained that there could be a shortened duration of certification if the certified medical examiner determines that a condition requires more frequent monitoring such as with hypertension, diabetes, or obstructive sleep apnea.

In conjunction with providing my opinions in this case, I have reviewed and relied upon the following regulations that are consistent with industry standards:

**Highlight 000486**





- o Federal Motor Carrier Safety Administration (FMCSA) regulations §391.41 (The physical qualification of drivers), §391.43 (medical examination and certificate of physical qualification) 49 CFR Appendix A to Part 391, Medical Advisory Criteria, §391.45 (persons who must be examined and certified-fitness for duty), §392.3 I (ill or fatigue operator) §383.111 (required knowledge for commercial vehicle driver) §391.51 (General Requirements for Driver's Qualification Files) § 382.303: Post-accident testing

- o Federal hours of service (HOS) regulations in Part 395 of Title 49 of the Code of Federal Regulations (CFR)

- o USDOT FMCSA Interpretations of the regulations.

- o FMCSA medical examiner instructions and advisory criteria

- o Ontario Medical Fitness Standards

## V. <u>SCIENTIFIC AUTHORITIES RELIED ON</u>

The scientific authorities that I have relied on to formulate my opinions and conclusions in this case are listed below:

- o Hartenbaum, N. **The DOT Medical Examination: A Guide to Commercial Drivers Medical Certification** (July 2017, Sixth Edition as well as the earlier editions, including the first edition that included the foreword authorized by this specialist)

- o FMCSA Medical Examiner Handbook (2013).

## VI. <u>FACTS OF CASE</u>

On August 8, 2020, Milanovic drove a truck, owned by HL Motor Group, through Canadian County, Oklahoma, within the scope and course of his employment with HL Motor Group.

It was an extremely hot day with temperatures in excess of 90 degrees that afternoon when Milanovic was driving in Oklahoma.[5]

At approximately 4:19 p.m., Milanovic was driving in a southerly direction on the Kilpatrick Turnpike, when he drove his truck off the highway. Milanovic traveled 260 feet off the roadway, and slammed into a home owned by Earlene Carr in Yukon, Oklahoma.

He was transported by EMSA, who arrived around 16:34 (4:34PM). His initial Glasgow score was 12. He was tachycardiac and had elevated blood pressure. It was noted that he had altered mental status.

---

[5] https://weatherspark.com/h/d/8231/2020/8/8/Historical-Weather-on-Saturday-August-8-2020-in-Oklahoma-City-Oklahoma-United-States#Figures-Temperature





From the patient care ambulance run record:

> H-EMSA was dispatched for reports of a semi vs house. Arrived on scene to find a semi facing northeast in the ditch of the John Kilpatrick Turnpike. Duplex is noted to be destroyed, tracks in the ground show to be coming from the southbound lanes of the turnpike, through the duplex, and around to where the semi is resting. Semi is noted to have severe front end damage w/ large amounts of debris in the vehicle.

> Pt is noted to be a 36-year-old male sitting in the driver seat of the semi who appears to be unrestrained. Pt is noted to be A&Ox2. Pt is noted to have a tin laceration to his left neck with controlled bleeding. Abrasions noted to R and w possible closed fracture. Pt is unaware that he has been in an accident. C-collar was applied to the Pt. Pt was placed on a LSB (spinal immobilization). LSB taken to stretcher, stretcher taken to ambulance. 18G IV established in the LAC w/ saline lock. Pt became slightly combative and attempted to refuse transport to the ER. Due to AMS Pt was being transported under implied consent. OCFD assisted EMSA during transport.

> A-GCS 14, A&Ox2, skin pink warm and dry, pupils PERRL, unknown LOC, retrograde amnesia, no JVD, no tracheal deviation, 1 in laceration noted to L. neck, chest wall stable w/ equal rise and fall, lung sounds clear and equal bilaterally, abdomen soft non-tender, pelvis stable, upper and lower extremities symmetrical w/ good range of motion, abrasions and possible closed fracture to R ankle. No other trauma noted.

> T- Emergent transport to OU Medical Center. Pt condition and vitals monitored throughout transport w/ no change in condition. Trauma alert was issued to OU Medical Center. Arrived at OU Medical Center. Pt taken to Trauma 3, transferred to hospital bed via LSB. Report given to Trauma team.

> R-C-collar, LSB, 18G NV established in the LAC w/ saline lock, trauma alert.

At the time of the accident on Driver was a male (DOB 7/30/84), employed at Highlight only just a few days before.  His medical certification for the Province of Ontario, where he had  Class A license was up to date according to  Ontario Driver that part of his DQ file. His next medical report was due on January 14, 2022.

The crash report shows that the accident took place around 4:19PM.

The report showed that there was no suspicion of impairment, drug or alcohol use on the behalf of the driver. Drug screen was negative[6].

Mr. Milanovic denied taking any medication He did not consume any alcohol  before the trip.

Review of the hours-of-service logs before the accident showed no violations on hours of service. He had driven 10 hours 18 minutes the day of the crash and he had total hours on duty that week at 34 hours 15 minutes (Highlight 000348 8/8/20 Hours of Service records)

He weighed 170 pounds and was 67 inches tall with a BMI around 26. His drivers' license photo did not reveal a large neck size

---

[6] This author has not seen the result of any post-accident alcohol test





## VII.   MEDICAL CHRONOLOGY

CAD Master Incident # 20-W-156077    Patient: Ognjen Milanovic    DOB: 7/30/84

8/8/20 – EMSA was dispatched for reports of a semi vs house  Arrived on scene found semi facing northeast in the ditch of the John Kilpatrick Turnpike.  Duplex is destroyed, tracks in the ground show to be coming from the southbound lanes of the turnpike, through the duplex and around to where the semi is resting. Semi noted to have severe front and damage with large amounts of debris in the vehicle.  Patient is a 36-year-old male sitting in the driver seat of the semi who appears unrestrained.  Noted to be A&O x 2. He is noted to have a 1-inch laceration to his left neck with controlled bleeding. Abrasions noted to right ankle with possible closed fracture. He is unaware that has been in accident. Denies any drinking, drug use, or any medications. C-collar applied, placed on back board, and taken to stretcher then taken to ambulance.  Patient became sightly combative and attempted to refuse transport to the ER.  Patient being transported under implied consent to OU Medical Center.  Patient condition and vitals monitored.

throughout transport with no change in condition

8/8/20 – Seen by Giselle Zagari Stuppiello, MD for puncture wound without foreign body of unspecified part of neck, initially tachycardia. 36-year-old status post MVA with laceration to left neck.  CT Angio without any signs of vascular involvement. Left ankle fracture, and neck laceration.

8/8/20 – Seen by Giselle Zagari Stuppiello, MD. No known allergies. Puncture wound of left anterior neck with oozing red blood.





**RADIOGRAPHY:**
<u>**PELVIS**</u>
FINDINGS: There is no evidence of acute fracture or dislocation. The visualized soft tissues are intact.
IMPRESSION: No radiographic evidence of an acute injury in the pelvis.

<u>**CHEST**</u>
FINDINGS: The inferior aspect of the right costophrenic angle is excluded from the field -of-view. The lungs are clear and well expanded. Heart size and pulmonary vasculature are within normal limits. The visualized osseous structures demonstrate no acute abnormality.
IMPRESSION:  No radiographic evidence of an acute cardiopulmonary process.

<u>**THORACIC SPINE**</u>.
IMPRESSION:
1. No evidence of acute intrathoracic, intra-abdominal or intrapelvic injury.
2. No evidence of acute injury in the osseous thoracic and lumbar spine.
3.  Partially visualized left neck soft tissue hematoma, please see separately dictated same day CTA neck for further findings.
4. These findings were discussed with Dr. Farnell of the Trauma Service.

<u>**CT LUMBAR SPINE**</u>

IMPRESSION:
1.  No evidence of acute intrathoracic, intra-abdominal or intrapelvic injury.
2.  No evidence of acute injury in the osseous thoracic and lumbar spine.
3.  Partially visualized left neck soft tissue hematoma.

<u>**CT CHEST WITH CONTRAST**</u>

FINDINGS:
Partially visualized soft tissue hematoma in the left neck, please refer to separately dictated same-day CT neck for further findings.

The lungs are essentially clear without focal consolidation, pneumothorax, pleural effusion of pulmonary vasculature are within normal limits. There is no significant thoracic lymphadenopathy.

Remote deformity of left lateral rib six otherwise, the osseous structures and overlying soft tissues of the chest wall are intact.  Specifically, the thoracic spine demonstrates no acute osseous injury.

Within the abdomen, the liver, gallbladder, biliary tract, pancreas, spleen, bilateral kidneys, and bilateral adrenal glands demonstrate no acute process.  Low attenuation within the liver along the falciform ligament is suggestive of focal fat. The visualized gastrointestinal tract demonstrates no acute process.

Within the pelvis, the urinary bladder, prostate gland, and seminal vesicles are within normal limits.  There is no evidence of intra-abdominal or pelvic lymphadenopathy, free fluid or free air.  The abdominal and pelvic vasculature is within normal limits.





The visualized osseous structures and overlying soft tissues of the abdomen and pelvis are intact. Specifically, the lumbar spine demonstrates no acute osseous injury.

**IMPRESSION:**
1. No evidence of acute intrathoracic, intra-abdominal or intrapelvic injury.
2. No evidence of acute injury in the osseous thoracic and lumbar spine.
3. Partially visualized left neck soft tissue hematoma.

## CT NECK ANGIOGRAM

IMPRESSION:
1. No acute intracranial process.
2. No evidence of acute injury in the osseous cervical spine.
3. No evidence of arterial injury in the neck.
4. Left neck soft tissue laceration/hematoma without evidence of active bleeding. There is a hyperdense focus measuring approximately 0.4 cm concerning for foreign body.

## CT ABD AND PELVIS WITH CONTRAST

FINDINGS:
Partially visualized soft tissue hematoma in the left neck, please refer to separately dictated same-day CT neck for further findings.

The lungs are essentially clear without focal consolidation, pneumothorax, pleural effusion, or pulmonary masses. The heart, great vessels and pulmonary vasculature are within normal limits. There is no significant thoracic lymphadenopathy.

Remote deformity of left lateral rib six otherwise, the osseous structures and overlying soft tissues of the chest wall are intact. Specifically, the thoracic spine demonstrates no acute osseous injury.

Within the abdomen, the liver, gallbladder, biliary tact, pancreas, spleen, bilateral kidneys, and bilateral adrenal glands demonstrate no acute process.  Low attenuation within the liver along the falciform ligament is suggestive of focal fat.  The visualized gastrointestinal tract demonstrates no acute process.

Within the pelvis, the urinary bladder, prostate gland and seminal vesicles are within normal limits. There is no evidence of intra-abdominal or pelvic lymphadenopathy, free fluid, or free air.  The abdominal and pelvic vasculature is within normal limits.

The visualized osseous structures and overlying soft tissues of the abdomen and pelvis are intact. Specifically, the lumbar spine demonstrates no acute osseous injury.





IMPRESSION:
1. No evidence of acute intrathoracic, intra-abdominal or intrapelvic injury.
2. No evidence of acute injury in the osseous thoracic and lumbar spine.
3. Partially visualized eft neck soft tissue hematoma

## CT CERVICAL SPINE WITHOUT CONTRAST

IMPRESSION:
1. No acute intracranial process.
2. No evidence of acute injury in the osseous cervical spine.
3. No evidence of arterial injury in the neck.
4. Left neck soft tissue laceration/hematoma without evidence of active bleeding. There is a hyperdense focus measuring approximately 0.4 cm concerning for foreign body.

## CT BRAIN WITHOUT CONTRAST

FINDINGS: No hydrocephalus. No mass effect. No midline shift. No acute intracranial hemorrhage. Basal cisterns are maintained. No focal osseous defects of the calvarium.

The included orbits and their contents appear intact. The visualized paranasal sinuses, mastoid air cells and middle ear cavities are clear.

Within the cervical spine, there is no evidence of a fracture or subluxation. The atlantooccipital and atlantoaxial articulations are intact. Likewise, the dens is unremarkable. Vertebral body height and alignment are well maintained. The disc spaces are preserved. The spinal canal and neural foramina are widely patent. There is no evidence of facet lock or perch. The posterior elements including the spinous processes are intact. The prevertebral soft tissues are unremarkable.

Left-sided arch with three-vessel branching. The left vertebral artery is dominant. The bilateral common carotid, internal carotid and vertebral arteries are well opacified and demonstrate normal courses.

There is no evidence to suggest arterial injury.

The soft tissues of the left neck, at the level of C5 there is a soft tissue laceration/hematoma. No evidence of acute bleeding. There is a hyperdense, 0.4 cm focus in the superficial soft tissues in this region concerning for foreign body.

Included portions of the lung apieces reveal no acute abnormality.

IMPRESSION:
1. No acute intracranial process.
2. No evidence of acute injury in the osseous cervical spine.
3. No evidence of arterial injury in the neck.
4. Left neck soft tissue laceration/hematoma without evidence of active bleeding. There is a hyperdense focus measuring approximately 0.4 cm concerning for foreign body.





## ANKLE MINIMUM 3 VIEWS RIGHT

FINDINGS: Frontal, lateral and oblique views of the right ankle and right foot are provided without comparison. In the right ankle, no acute fractures or dislocations are demonstrated. The overlying soft tissues appear intact.

IMPRESSION:
1. No radiographic evidence of an acute injury in the left ankle.
2. In the right foot, there is a small hyperdensity projecting in the soft tissues lateral to the base of the fifth metatarsal, which is of uncertain etiology. Recommend correlation for tenderness at this site.

## FOOT MINIMUM 3 VIEWS RIGHT

IMPRESSION:
1. No radiographic evidence of an acute injury in the left ankle.
2. In the right foot, there is a small hyperdensity projecting in the soft tissues lateral to the base of the fifth metatarsal, which is of uncertain etiology. Recommend correlation for tenderness at this site.

**CLINICAL IMPRESSION**:
Open neck wound, Tachycardia.

## VIII: OPINIONS

1) Mr. Milanovic was a fit and medically qualified driver at the time of the motor vehicle collision that took place on. He held a valid Class A Commercial Drivers' License from Ontario that has an integrated medical fitness program with licensure.

2) His employer was not aware of any medical issues that Milanovic had. Nor did his employer express any concerns about his driving or his fitness to drive. It is important to note that he was just starting out for Highlight.

3) Mr. Milanovic was medically qualified to operate a commercial motor vehicle on the date of his last medical examination sometime in 2017.

4) No hours-of-service fatigue issues exist in this case as he within his hours-of-service requirements.

5) There were no drug and/or alcohol issues in this case.

6) Milanovic denied he had been drinking or using any drugs as noted in the OU medical records and by his own testimony.

7) Milanovic denied taking any prescription medication as noted in the OU medical records and by his own testimony.

**Highlight 000493**                                                          Page **18** of 21





8)  There was no evidence he has a seizure.

9)  He does not have Obstructive Sleep Apnea (OSA). His BMI is 26. He does not have a large neck size. Mr. Milanovic does not have a sleep disorder.  He only had 1 out 8 possible OSA risk factors.

10) He did not fall asleep according to his testimony and the facts in the case. [7]

11) Review of the DQ file shows compliance by Highlight of the FMCSA and Ontario regulations.

12) Mr. Milanovic was medically qualified to drive when Highlight Motor Freight USA, Inc. Transportation USA, LLC  placed Milanovic behind the wheel of their truck at the time of the accident on 8/8/20.

13) There is no evidence of any impairment from drug or alcohol issues that caused this incident.

14) Mr. Milanovic  was suddenly incapacitated due to the effects of dehydration on a hot day (temperatures above 90. He suffered a classic heat-related acute illness. The urine results showed a concentrated specific gravity  of 1.40. He had evidence of electrotype imbalance. His serum potassium and chloride were low. He was tachycardiac with ventricular rates greater than 150 b/p/m. He had elevated blood pressure. His blood glucose levels were not low. No other medical condition or explanation was uncovered.

15) The fact that he was quickly discharge from the hospital ER and allowed to leave the hospital is significant because he did not have a medical condition that required on-going monitoring. The acute effects from being dehydrated dissipated with IV fluids. His Glasgow score returned to normal, and he no longer had any altered mental status.

16) He was fit to drive the day after the crash because he had no chronic medical condition that raised any concerns about his medical fitness.

17) It is notable that since the crash he has no additional medical care and that he takes no medication.

18) There are in existence no pre-crash medical records that provides any basis to believe Milanovic has some pre-existing medical condition that caused this crash.

19) Likewise, there are no post-crash exist to suggest that a medical condition caused the crash.

---

[7] **Milanovic testimony page 65:22-25** Q? did you fall asleep answer I know I don't think so as it was still day So what they told me is that I lost consciousness.





20) As a result of the sudden loss of consciousness, made it impossible for Mr. Milanovic to operate and control his vehicle.[8]

21) At the time of the incident, Mr. Milanovic had no reason to anticipate that he could or would experience a sudden loss of consciousness due to an acute heat-related illness.

22) Prior to the incident, Mr. Milanovic had never experienced a syncopal episode related to dehydration related to resulting in a loss of consciousness. [9]

23) Prior to the incident, Mr. Milanovic had never experienced any syncopal episode for any reason whatsoever.

24) The sudden emergency doctrine applies in this case because this collision is shown to have occurred because of a sudden emergency, not of the defendants' own making. This common law principle applies when one suddenly finds themselves in a place of danger and is required to quickly act without having enough time to consider the best means or not having the ability to weigh alternatives regarding the impending danger. In this instance this places the individual as not guilty of negligence unless the emergency is brought about by his own negligence." The 'sudden emergency' must be "unusual," or "unsuspected."

25) Pursuant to Oklahoma law, when the operator of a motor vehicle is suddenly stricken by a period of unconsciousness for which he has no reason to anticipate and which renders it impossible for him to control the vehicle that he is operating, he is not chargeable with negligence or negligence *per se* as to such lack of control.

26) Pursuant to Oklahoma law, the sudden medical emergency defense, also known as the "unforeseen unconsciousness" defense, is a complete defense to an action based on the asserted negligence of a defendant driver of a motor vehicle. As such, the sudden medical emergency that rendered Mr. Milanovic unconscious, which was unforeseeable, bars plaintiffs' claims against defendants.

---

[8] Milanovic testimony page 74:4-199: I think the last one told me it could have been due to fatigue and dehydration or something that it that there was too many variables for them to pinpoint why it happened. Q? Who told you that answer but they told me some doctor I can't recall. Is that a doctor that you saw after August 8th 2020 answer I don't recall I think the one at the hospital told me was a sudden loss of consciousness. Q- Have you seen any doctors since August 2020 for the purpose of trying to find out why you lost consciousness on August 8th 2020 answer I don't think so.

[9] Milanovic testimony; page 68:8-15





27) Here, Mr. Milanovic's loss of consciousness was a sudden emergency, as it was unusual and unsuspected. There is no evidence in the record that during the days, weeks, or months leading up to the accident that Mr. Milanovic had any medical issue that interfered with his ability to operate a commercial vehicle. Mr. Milanovic had no knowledge of any pending medical issue. This is especially true in this case as Mr. Milanovic had no symptoms that would have warranted him to follow up with a physician. Mr. Milanovic was not experiencing any symptoms that would indicate a problem related to his heart, respiratory or any other body system. Any assertion by a plaintiff's expert to the contrary, would be based on speculation and conjecture. There is no doubt that Mr. Milanovic experienced a sudden medical emergency on that fateful day.

28) Mr. Milanovic was not a negligent, reckless driver and did not have any willful intent to harm others on the road. Mr. Milanovic had a history of always operating his truck in accordance with accepted safety principles and practices of the trucking industry.

29) From a medical standpoint, Mr. Milanovic was physically fit to drive a truck in accordance with the FMCSA guidelines and regulations, as well as those of the Province of Ontario in August 2020. Mr. Milanovic had no medical condition likely to interfere with his ability to operate a commercial motor vehicle safely.

30) There were no indications or awareness on employer's part that Mr. Milanovic was going to have an unforeseen medical event on the date of the accident, August 2020.

I reserve my rights to supplement my opinions when and if presented with new information.

I swear the foregoing is true and accurate to the best of my knowledge and belief.

DAVID J. FLETCHER, MD