# EXHIBIT 5

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF OKLAHOMA
RANDY LUNDY,           )
    Plaintiff,         )
                       )
       -vs-            ) No. CIV-22-699-F
                       )
HL MOTOR GROUP, INC., ET )
AL.,                   )
    Defendants.        )
_____
FARMERS MUTUAL FIRE INSURANCE )
COMPANY OF OKARCHE,    )
    Plaintiff,         )
                       )
       -vs-            )
                       )
HL MOTOR GROUP, INC., ET AL. )
    Defendants.        )


    VIDEOTAPED/TELECONFERENCE DEPOSITION OF ALEXANDER SAITOV
                  TAKEN ON BEHALF OF
       FARMERS MUTUAL FIRE INSURANCE COMPANY OF OKARCHE
                    ON APRIL 5, 2023

       REPORTED BY:  MARTA MATTINGLY, CSR, RMR
```

**Page 2**

```
 1              A P P E A R A N C E S
 2
    For Randy Lundy:      Rodney Stewart
 3  (via Zoom)            STEWART LAW FIRM
                          Attorney at Law
 4                        801 N.W. 63rd, Suite 100
                          Oklahoma City, OK  73116
 5                        rds@rstewartlaw.com
 6  For Farmers:          Gerard Pignato
    (via Zoom)            RYAN, WHALEY
 7                        Attorney at Law
                          400 North Walnut
 8                        Oklahoma City, OK  73104
                          jerry@ryanwhaley.com
 9
    For HL Motor Group    Michael Franz
10  and Ognjen Milanovic: LEWIS, BRISBOIS
    (via zoom)            Attorney at Law
11                        1605 West Adams, #300
                          Chicago, IL  60661
12                        michael.franz@lewisbrisbois.com
13  Also present:         Eric Keiffer - Videographer
    (via Zoom)            J. Butterworth
14
15
```

**Page 3**

```
 1              C O N T E N T S
 2  DIRECT EXAMINATION BY MR. PIGNATO ................  5
 3  CROSS EXAMINATION BY MR. STEWART .................  38
 4
 5              E X H I B I T S
 6  EXHIBIT NUMBER 1 ................. 18
 7  EXHIBIT NUMBER 2 ................. 30
```

**Page 4**

```
 1              S T I P U L A T I O N S
 2       It is hereby stipulated and agreed by and
 3  between the parties hereto, through their respective
 4  attorneys, that the deposition of ALEXANDER SAITOV may
 5  be taken on behalf of Farmers on April 5, 2023, via
 6  Zoom, by Marta Mattingly, Certified Shorthand Reporter
 7  within and for the State of Oklahoma, pursuant to notice
 8  and agreement.
 9       It is further stipulated and agreed by and
10  between the parties hereto, through their respective
11  attorneys, that the deposition is taken pursuant to The
12  Federal Rules of Civil Procedure.
13
14              * * * * *
```

Page 33

1   confused, very confused.  Obviously, he was stressing
2   out.  But I examined his logbooks, he complied.  He had
3   necessary -- he took necessary rest breaks, slept for
4   ten hours.  So based on this evidence, the conclusion --
5   the conclusion that he was sleepy, it's speculation.
6   There wasn't evidence that he was sleepy.
7       Q   So if I understand you correctly, the evidence
8   that supports your belief that Mr. Milanovic lost
9   consciousness before he left the roadway is, in part,
10  the medical records for his treatment at Oklahoma
11  Medical Hospital after this accident?
12      A   Yes.  Yes.
13      Q   Do any of the medical records say he lost
14  consciousness before he left the roadway as opposed to
15  his impact with the houses?
16      A   I -- I don't recall that any of medical
17  records says that.
18      Q   What medical condition, then, caused him to
19  leave the roadway?
20      A   I am not medical expert.  I cannot tell you --
21      Q   Does your company --
22      A   I cannot answer this question.
23      Q   I interrupted you.  I apologize.  Does your
24  company take a position on whether or not Mr. Milanovic
25  had a medical condition that caused him to lose

Page 34

1   consciousness and leave the roadway?
2       A   It's our company's understanding, that due to
3   some medical condition, medical emergency condition, he
4   lost consciousness, and after that, he departed and went
5   off the road.
6       Q   I understand that's the company's position.
7   My question to you, sir, is, does your company have a
8   position, an opinion, on the nature of the medical
9   condition in question?  What was that medical condition?
10          MR. FRANZ:  Objection.  That calls for
11  expert testimony.
12      Q   (By Mr. Pignato)  Go ahead.
13          MR. FRANZ:  You can answer, Alex.
14          THE WITNESS:  So I am not a medical
15  professional.  We don't -- we are not familiar, we
16  cannot judge and provide our opinion on -- we are not
17  professionals in the field on what type or nature of
18  medical condition led to him lose consciousness.
19      Q   (By Mr. Pignato)  Do you know if anyone has
20  ever identified a medical condition that caused him to
21  lose consciousness and leave the roadway?
22      A   I don't.
23      Q   But in any event, Highlight, your employer, is
24  unaware of a medical condition that caused Mr. Milanovic
25  to lose consciousness and leave the roadway; am I

Page 35

1   correct?
2       A   We are not --
3           MR. FRANZ:  Objection.  That misstates
4   prior testimony.
5       Q   (By Mr. Pignato)  Go ahead.
6       A   As long as my legal counsel is objecting, I
7   would rather not answer this question.
8           MR. FRANZ:  No, Alex, you can answer.  I
9   have laid the objection, but you can answer the
10  question.  I am not instructing you to not answer.
11          THE WITNESS:  So we are not aware of the
12  name or nature of that medical condition.
13          MR. STEWART:  Are we finished with the
14  exhibit?
15          MR. PIGNATO:  Yes, thank you, Rodney.
16          MR. STEWART:  That's apparently my job
17  today, my role.
18          MR. PIGNATO:  I have a feeling you are
19  going to have a much more important role shortly.
20      Q   (By Mr. Pignato)  Mr. Saitov, do you know
21  whether or not Mr. Milanovic has experienced any similar
22  medical episodes since or after August 8, 2020?
23      A   No.  I am not aware.
24      Q   Do you know if any doctor has ever told Mr.
25  Milanovic, after August 8, 2020, that he suffered some

Page 36

1   sort of medical episode on August 8, 2020, that caused
2   him to lose consciousness and leave the roadway?
3       A   I don't.
4       Q   I want to ask you a couple of questions
5   regarding liability insurance.  As a safety director, do
6   you have any responsibility in procuring liability
7   insurance for the company?
8       A   Yes, I do.
9       Q   And we have been provided information
10  regarding the liability insurance that was provided to
11  Highlight at the time of the accident.  My question to
12  you is, do you know whether or not your company had a
13  self-insured retention?  Do you know what that is?
14      A   A self-insured retention?  Would you please
15  explain it to me?
16      Q   Yeah.  Where the liability insurance kicks in
17  after a certain amount of money has first been incurred
18  by the company.  It might be 100,000, 500,000, a
19  million.  It's different with everyone.  Do you know if
20  that's applicable in this case?
21      A   So if that's what we call deductible, is it
22  the same?
23      Q   They are similar.  There are some differences.
24  But if you have a deductible, I would like to know what
25  you understand your deductible is?

Alexander Saitov                                                                                     April 5, 2023

Page 49

1  between impairment, when driver is impaired by whatever
2  reason is, by fatigue or by dehydration, to the extent
3  that he is not able to control the vehicle and the
4  reason of that as mild dehydration.  So I don't
5  understand what it means.  Give me an objective
6  definition of -- definition of mild dehydration.
7      Q   I can't -- I can't give you a medical
8  definition.  But I am simply -- the purpose of my
9  questions today is just to find out if you are aware of
10 the concept, that dehydration leads to impairment, leads
11 to a driver not being his physical and mental best?  Are
12 you aware of it or not?
13     A   As I previously mentioned, I would agree that
14 extreme dehydration, to the extreme levels, to the
15 extreme levels, would lead to the impairment, which
16 would affect the ability to operate a commercial motor
17 vehicle.
18     Q   All right.  And do you agree that an extreme
19 level of dehydration would be a preventable circumstance
20 by the driver?
21     A   I would agree.
22     Q   If a person had dehydration to the extent that
23 they lost consciousness, you would agree that would be
24 preventable by the truck driver?
25     A   I would agree.

Page 50

1      Q   All right.  So does HL provide any new hire,
2  long-haul, truck drivers any training regarding proper
3  hydration?
4      A   That is not part of our training program.
5      Q   Does HL have any policies in place to prevent
6  incidents of driver dehydration?
7      A   It's not of our policies.
8      Q   So, then, is it HL's position that proper
9  hydration for its drivers is solely the responsibility
10 of the truck driver?
11     A   It is obviously a responsibility of the truck
12 driver.  But, again, what HL does, it enforces hours of
13 service policy, requiring drivers to take rest breaks,
14 specifically for theirs needs of drinking water, eating
15 properly, and other issues relating to their health and
16 well-being.
17     Q   All right.  So as long as the driver stops at
18 least once every eight hours, then the responsibility to
19 stay hydrated rests solely with the driver?
20     A   Responsibility stays, yes, with the truck
21 driver, yes.
22     Q   And I think you have already said this, but
23 just to be clear, do you agree that dehydration is
24 100 percent avoidable?
25     A   Dehydration is 100 percent avoidable, yes.

Page 51

1      Q   And you also would agree a driver is
2  responsible for keeping himself physically and mentally
3  alert while driving; agree?
4      A   Can you repeat it again?
5      Q   Sure.  A driver is responsible for keeping
6  himself physically and mentally alert while driving?
7      A   Absolutely.
8      Q   All right.  A driver is responsible for
9  ensuring that he or she is properly hydrated at all
10 times to avoid any negative effects of dehydration;
11 agree?
12     A   Can you repeat again?
13     Q   Sure.  A driver is responsible for ensuring
14 that he or she is properly hydrated at all times to
15 avoid any negative health consequences of the
16 dehydration, that might impair the ability to drive?
17     A   Agree.
18     Q   And, of course, a driver is responsible for
19 being aware of the signs of fatigue or dizziness or
20 weakness or any other symptom that could impair one's
21 ability to operate a 55,000-pound motor vehicle at
22 seventy-five miles per hour safely; agree?
23     A   Agree.
24     Q   And in this context, I want you to assume that
25 Mr. Milanovic was dehydrated and that's why, as you say,

Page 52

1  he lost consciousness.  All right?
2      A   Not all right.
3      Q   Say again?
4      A   Not all right.  You want me to assume.  I
5  don't assume.
6      Q   Well, you do assume, and you've testified
7  previously to Mr. Pignato, you do assume that your
8  driver lost consciousness before he left the roadway;
9  correct?
10     A   Correct.
11     Q   All right.  So I want you to assume for the
12 moment that your defense in this case, whether you know
13 it or not, is that your driver was dehydrated and that's
14 why he lost consciousness.  Okay?  Will you make that
15 assumption with me for purposes of these questions?
16     A   So you just want me to hypothetically assume?
17     Q   I want you to assume my hypothetical, which
18 is, your driver lost consciousness because he was
19 dehydrated, yes.  Will you assume that for purposes of
20 my question?
21     A   For the purposes of -- just for the sake of
22 the question, I can hypothetically assume it.
23     Q   So you would agree, if those were the facts,
24 that would be a self-induced condition, that is,
25 dehydration?

13 (Pages 49 to 52)

Page 53

1   A   That would be self-induced, sorry, what?
2   Q   The condition, the medical condition here, of
3   dehydration, would be self-induced; agree?
4   A   Medical condition. So dehydration as a
5   medical condition will be self-induced by the driver;
6   right?
7   Q   That's my question to you. If the driver
8   becomes dehydrated and that's the reason he lost
9   consciousness, that is a self-induced medical condition;
10  agree?
11  A   Agree.
12  Q   Entirely preventable by the driver?
13  A   Absolutely preventable.
14  Q   All right. Now, I want you to also assume
15  that the driver, your driver, has testified in this case
16  that one of the problems he was having while driving on
17  this hot, summer day through Missouri and Oklahoma in
18  ninety plus degree temperatures is that the
19  air-conditioning unit of his truck was not functioning
20  properly. Okay? Will you make that assumption with me?
21  A   Okay. Let's make an assumption.
22  Q   Okay. You agree with me, that would also be a
23  preventable factor; right, sir?
24  A   In terms of repair of conditioner, yes.
25  Q   So if a driver is feeling fatigued or dizzy

Page 54

1   due to dehydration, brought about by the absence of
2   fluids and/or the rising temperatures in his truck,
3   those are preventable factors; correct?
4   A   Correct.
5   Q   All right. A driver is responsible for
6   pulling over immediately on any signs or symptoms of
7   dehydration or other health factors that influence his
8   ability to drive the truck safely; right?
9   A   No.
10  Q   He is not responsible for pulling over
11  immediately among signs or symptoms that he can't
12  properly operate the truck?
13  A   Not necessarily immediately.
14  Q   Well, as soon as he can do so safely.
15  A   As soon as he can do it safely.
16  Q   All right. You wouldn't want him slamming on
17  the brakes in the middle of the highway; right?
18  A   Right.
19  Q   If he couldn't get adequately off the roadway,
20  and therefore became a hazard on the side of the road,
21  you wouldn't want that; right?
22  A   Right.
23  Q   But as soon as a truck driver could get to an
24  exit, if he's having signs or symptoms of heat or other
25  health issues that prevent him from operating the truck

Page 55

1   safely, you would expect him to pull over as soon as it
2   was safe to do so?
3   A   Absolutely.
4   Q   If a driver fails to do that, puts himself in
5   a state of dehydration by not consuming sufficient
6   fluids, not getting enough minerals, maybe operating a
7   truck that's too hot, and succumbs to this condition and
8   a collision results, you would agree that collision is
9   entirely that driver's fault?
10  A   I wouldn't.
11  Q   You wouldn't agree with that?
12  A   I wouldn't agree with it.
13  Q   So what part of it do you disagree with?
14  A   Not necessarily dehydration would play such a
15  role, that it would affect his ability to operate the
16  motor vehicle to such extent that he wouldn't be able to
17  operate safely.
18  Q   So you are saying you don't -- you don't know
19  if that occurred here?
20  A   As I previously said, your assumption implies
21  that any sign, any sign. I, again, am pretty sure that
22  only extreme level dehydration would lead to the
23  condition where he is not able to operate the vehicle
24  safely.
25  Q   Let's see if you and I can agree on something.

Page 56

1   Does it seem plausible or implausible to you that a
2   person would drive a good part of a hot August day in
3   Missouri and Oklahoma, while suffering from such severe
4   dehydration, that he loses consciousness and runs off
5   the road, yet, he wouldn't have any symptoms at all
6   before the moment he lost consciousness? Does that seem
7   plausible or implausible?
8   A   You know, speaking about some hypothetical --
9   Q   Plausible or implausible, sir?
10  A   Can I please answer your question?
11  Q   You can answer the question, then you can
12  elaborate all you would like. Does that seem plausible
13  or implausible?
14  A   Sir, would you allow me to answer the
15  question? I will answer the question.
16  Q   I would ask that you do so. Is it plausible
17  or implausible? Then you can explain your answer.
18  A   My explanation is that, specifically in case
19  of Ognjen Milanovic, looking at his logbook, took a
20  restroom break three hours before the accident, it's
21  not -- it's not possible in his situation, because he
22  had three hours before that took a rest break of
23  forty-five minutes, as I see on his logbook.
24      And for me, three hours of driving is not
25  enough to get to such a level of dehydration, that he

Page 57

1  would be able to lose control, lose consciousness, lose
2  control of his vehicle.
3          Maybe in some other case it's plausible, with
4  some other guy, who probably, possibly drove without the
5  rest break, not three hours, but let's say, I don't
6  know, fifteen hours.
7          But in his case, in his specific case, where
8  we know exactly that he took a break three hours before
9  the accident, that is not plaus -- it's not possible.
10     Q   All right.  I think we might be saying the
11 same thing, but let me try to make sure about that
12 before I move on.  You are saying, that because this man
13 took a 45-minute break just three hours earlier, you
14 believe it is not plausible that he succumbed to
15 dehydration in an instant and lost consciousness and ran
16 off the road without experiencing any other symptoms
17 first?  Do you agree with that?
18     A   Sir, I -- again, I am not medical
19 professional.
20     Q   I accept that.  I am asking for --
21     A   I don't know whether it happens in an instant.
22 I have no idea how it happens.  Maybe it takes a few
23 minutes.  I don't know.  So if you could rephrase your
24 question, then I would be able to properly answer it.
25     Q   I am not sure I can.  You are relying on the

Page 58

1  fact that this gentleman took a three-hour break -- I'm
2  sorry, a 45-minute break three hours before; right?
3      A   Yes.  He took a rest, yeah.
4      Q   And because of that, you do not believe that
5  he succumbed to dehydration, to the extent that he lost
6  consciousness and ran off the roadway; right?
7      A   I don't believe that he succumbed to,
8  specifically to the reason of dehydration.
9      Q   Okay.
10     A   Because of dehydration.
11     Q   You believe that makes no practical sense to
12 you?
13     A   Correct.
14     Q   As the safety manager and/or vice-president of
15 safety for this company for some eight plus years;
16 right?
17     A   I think practically he took a rest break of
18 forty-five minutes, which is more than enough for him to
19 drink water, eat properly.  And I don't believe that he
20 taking rest -- that rest break, wouldn't be able to do
21 it.
22     Q   Would common sense, and I know you are not a
23 medical doctor, but would common sense, if dehydration
24 was the medical condition that caused him to lose
25 consciousness, if that's true, okay, do you believe, in

Page 59

1  your experience in life and as the safety manager for
2  this company, that it's possible for a person to succumb
3  to dehydration at such a fast rate, that the very first
4  sign of a problem was the loss of consciousness?
5      A   Sir, for all of my experience, and I think
6  I've had a relatively large experience with a large
7  number of accidents, I never, ever observed weakness
8  that dehydration played any such role.
9      Q   In causing a driver to lose consciousness and
10 have a collision?
11     A   Yes.
12     Q   All right.  And you make a good point.  I
13 mean, you've probably investigated hundreds of
14 accidents, a thousand or more?
15     A   I don't know the exact number.  But from my
16 experience, I knew cases where drivers were able to
17 travel with not working AC and they were able to travel
18 large distances.  And it didn't lead to the loss of --
19 their ability to operate commercial vehicle was not
20 impaired to such -- to such a level, where they lost
21 consciousness and lost control of their vehicle.
22     Q   Well, you make me pause and ask this, then.
23 You are telling me that you have seen situations where
24 drivers operate on hot days with not fully functioning
25 air-conditioning units.

Page 60

1      A   Yeah.
2      Q   And, yet, that didn't lead to, wasn't a
3  contributing cause, to the collision, is that what you
4  are telling us?
5      A   Yes.
6      Q   All right.  Then how is it that you, as the
7  safety manager or vice-president of safety, are aware of
8  the fact, that after a collision, there was a
9  nonfunctioning air-conditioning unit?
10     A   You mentioned the fact that the air
11 conditioner was not working.
12     Q   Okay.
13     A   I am not aware of it.
14     Q   You are not aware of any problems with the AC
15 units in the trucks --
16     A   No.
17     Q   -- that you all put out on the roadway?
18     A   No.
19     Q   Do you agree, as a responsible motor carrier,
20 HL is certainly aware of the critical need for properly
21 functioning air-conditioning units in its trucks;
22 correct?
23     A   Absolutely correct.
24     Q   All right.  And you, of course, are aware that
25 a poorly performing AC unit, particularly in the hot

Page 61

1  summer months, particularly in the south, can contribute
2  to drivers overheating, becoming dehydrated, fatigued,
3  et cetera; correct?
4      A    Correct.
5      Q    All right.  So is HL responsible for ensuring
6  that the AC units in its big rigs are functioning
7  properly?
8      A    Correct.
9      Q    And at the same time is the driver responsible
10 for reporting any problems with the AC unit in the truck
11 he or she is driving?
12     A    Absolutely correct.
13     Q    All right.  Is it -- is it acceptable to HL,
14 that a driver from northern climates, on his very first
15 trip for HL into the south in the hot summer months,
16 drove ten plus hours on a ninety plus degree day with a
17 poorly performing air-conditioning unit in his truck and
18 did not report that to the company?
19     A    Yeah.  That's -- that's not acceptable.  A
20 driver always -- any driver is supposed to report
21 anything to the company right away.
22     Q    And you have investigated this accident
23 thoroughly.  Have you come across any evidence at all
24 that your driver, Mr. Milanovic, reported to the company
25 before, during, or after his trip, that the

Page 62

1  air-conditioning unit was performing poorly?
2      A    He had never reported any of that.
3      Q    Okay.  Would it be acceptable, if that same
4  driver in those same circumstances, driving ten plus
5  hours in the heat, becomes dehydrated, loses
6  consciousness, and drives off the road into family
7  residences, is that acceptable to HL?
8      A    Absolutely not acceptable.
9      Q    All right.
10     A    I'm sorry, my camera.
11     Q    And do you agree, if those are the facts, the
12 accident I just described, you would agree with me that
13 accident would be entirely preventable?
14     A    Would I agree, this vehicle accident would be
15 preventable?
16     Q    Yes.  If the facts are as I laid out to you.
17 And I am really focusing on two facts.  You have got a
18 poorly performing air-conditioning unit and a driver who
19 becomes dehydrated to the point of losing consciousness.
20 Those two factors are both entirely preventable, aren't
21 they, sir?
22     A    So he -- if, again, we assume that he got
23 dehydrated to the point of losing consciousness, if.
24     Q    Yes.  And, in part, his dehydration was
25 brought about by a poorly functioning air conditioner,

Page 63

1  you would agree with me that both of those things are
2  entirely preventable by the company and/or the driver?
3      A    Again, given all -- if -- if the loss of
4  consciousness is caused by dehydration, then, yes.
5      Q    All right.  Can you show us -- it's going to
6  be difficult, I don't know if you have the wherewith all
7  or not to share your screen.  It sounds like you have
8  paper documents there.
9           Can you show us, if you have to hold it up to
10 your camera, that's fine.  But I want to see breaks that
11 this gentleman took in the five hours before his
12 collision.
13          All right.  Now, I have seen that document in
14 a colored form.  Down at the bottom of that page, sir,
15 is there a Bates stamp, a control number in the bottom
16 right corner?
17     A    It says Report Time, there is a time stamp
18 here.
19     Q    I am looking in the bottom right corner.  Is
20 there a control number there?
21     A    Bottom right corner, it's a page, it's not a
22 control number.
23     Q    Okay.  But the date of that log is the date of
24 the accident?
25     A    The date is August 8th.

Page 64

1      Q    Okay.  Can you take us through -- let's work
2  our way backwards.  When was the last time that truck --
3  as I understand it, the logs -- you can put the exhibit
4  down now.  As I understand it, the logbooks are largely
5  electronic; agreed?
6      A    They are all electronic.
7      Q    And as Mr. Milanovic explained in his
8  deposition, a truck rolling down the road, it being in
9  motion, results in what entry on the log?  What's the
10 magic language on the log that tells you that the truck
11 is in motion?
12     A    Driving time.
13     Q    Driving time, okay.  And if the truck is not
14 in motion for how many minutes before it changes to
15 another term?
16     A    It's a new vers -- it's a new model.  So it's
17 not even in minutes, it's literally -- maybe not in a
18 second, but within one minute.
19     Q    Within one minute, okay.  For purposes of our
20 analysis here, we will just say within one minute.
21 Okay?  So when is the last time before this collision
22 this truck was not in motion or under the category
23 driving time?
24     A    Okay.  Just a second.
25     Q    I am looking for two things, when and where.